## VREELAND *vs.* McCLELLAND.

*In the matter of proving the last Will and Testament of* D. W. GAUTIER, *deceased.*

IF the decedent, not an inhabitant of the State, die out of the State, without leaving assets in the county, and no assets have come into the county since his death, the Surrogate has no jurisdiction to take proof of his will as a will of personal estate.

In such a case, if no other Surrogate has gained jurisdiction, the Surrogate of the county where "any real estate devised by the testator shall be situated," may take proof of the instrument as a will of real estate. The Surrogate has jurisdiction, provided the will on its face purports to devise real estate situated in the county, whether such lands were in fact owned by the decedent or not. And if the title or ownership be disputed, he will not try that question as a preliminary to the exercise of jurisdiction.

Implied revocations are regulated by the provisions of the Revised Statutes. The decedent executed instruments purporting to be a trust deed and a will, the same day, by the former of which he reserved to himself a life-estate in certain lands:—Held that the provisions of the two instruments being not inconsistent, but in harmony with each other, and the grantor not hav-

ing " wholly divested" himself of his interest in the property, the will was not revoked by the deed.

The decedent, owning a large estate devised to him by E. L., deceased, the day before his departure for Mexico, executed a will and a trust deed, giving all his property after his decease to H. V., an uncle by marriage. H. V. was the acting executor of the will of E. L., and had never accounted, but kept the estate under his charge, paying the decedent small sums from time to time. The deed and the will were drawn by the counsel for the estate, and executed at his office, and immediately thereafter, the executor paid the decedent nearly $500, for the expenses of his journey.—Held that the will having under such circumstances been drawn in favor of the executor or trustee, when still in the active management of the estate, and not having accounted with the *cestui que trust*, it could not be supported without satisfactory evidence of its entire fairness ; the fiduciary relations between the parties, creating a presumption against the act, and rendering necessary clear proof of volition and capacity.—Also held that the decedent, being of irregular and intemperate habits, of weakened capacity, and dependent on the executor whom he made his devisee for the satisfaction of his pecuniary wants, the legal presumption was confirmed ; and the proof being defective, the will should be rejected.

The facts of this case sufficiently appear in the opinion of the Court. The petition for probate, the will, and the trust deed, referred to in the opinion, are as follows :—

COUNTY OF NEW-YORK, } PETITION.
SURROGATE'S COURT.

### *To the Surrogate of the County of New-York :*

The petition of John Leveridge, of the city of New-York, and Hartman Vreeland, of Bergen, Hudson County, New Jersey, respectfully showeth :

That your petitioners are executors of the last will and testament of Daniel W. Gautier, late of the county of Hudson, in the State of New Jersey, deceased ; that the said deceased was at or immediately previous to his death, an inhabitant of the said county of Hudson, and departed this life in said county, on the twenty-third day of December last, and that said last will and testament relates to both real and personal estate.

Your petitioners further show, that the heirs and next of kin of said deceased, are Alexander McClelland, residing at New-Brunswick in the State of New-Jersey; Ann Hewett, wife of Clark Hewett, severally residing at Watertown, in the county of Jefferson, and State of New-York; Hannah Mason, wife of John W. Mason, severally residing at Newark, in Kendall county, in the State of Illinois; Mary Cassiday, wife of James Cassiday, severally residing at Fairfield, in the county of Franklin, and State of Indiana; Charlotte Gautier, residing at Bergen, in the county of Hudson, and State of New-Jersey; Eliza B. Vreeland, wife of your petitioner, Hartman Vreeland, severally residing at said Bergen, the uncle and aunt of said deceased; and Thomas B. Gautier, Helen D. French, widow, severally residing at Jersey City, in the State of New Jersey, and Samuel T. Gautier, residing in the city of New-York, the children of Thomas Gautier, a deceased uncle of said testator; and John G. Van Horn, Jr., residing at Bergen aforesaid, and Hartman V. Van Horn, residing in the city of New-York, the children of Margaret Van Horn, a deceased aunt of said testator; and that they are all of full age. That the said deceased was never married, and has left no father or mother, brother or sister, and no other heirs and next of kin than the above named, him surviving.

Your petitioners therefore pray, that the said last will and testament may be proved, and letters testamentary granted thereon according to law.

JOHN LEVERIDGE,<br>HARTMAN VREELAND.

*City and County of New-York*, ss.:—We, John Leveridge, and Hartman Vreeland, the petitioners named in the foregoing petition, being duly sworn, do depose and say, that we have read the foregoing petition, to which we have subscribed our names, and know the contents thereof, and that the matters of fact therein stated are true; and

that the matters therein stated on our information and belief, we believe to be true.

JOHN LEVERIDGE,
HARTMAN VREELAND.

Sworn this sixteenth day of January, A. D., 1849, before me,
    A. W. BRADFORD, *Surrogate.*

## WILL.

In the name of God, Amen. I, Daniel W. Gautier, of the city and State of New-York, gentleman, do make, publish and declare this to be my last will and testament. First, I order and direct, that all my just debts, funeral and testamentary expenses, be paid as soon as conveniently may be after my decease. Second, I do give, devise, and bequeath unto Hartman Vreeland, of Bergen, in the county of Hudson, and State of New Jersey, gentleman, all my real estate situate in the county of Hamilton, State of New-York: also, all my real estate situate in the city of New-York, on Oliver Street, Cherry Street, Water Street, and South Street, in the Fourth Ward of the said city of New-York: also, all other real estate situate in the city of New-York, and in any other place or places belonging unto me: also, all the real and leasehold estate belonging unto me, situate in Beaver Street, in the said city of New-York: the said real estate and leasehold estate being devised and given unto me by Elizabeth Lewis, now deceased: and also all my personal estate, of whatever nature and description, and wherever situate: to have and to hold the same unto the said Hartman Vreeland, his heirs, executors, administrators and assigns forever. Lastly, I do hereby constitute and appoint the said Hartman Vreeland and John Leveridge, of the city of New-York, executors of this my last will and testament, hereby revoking and making null and void all former and other wills by me at any time heretofore

made. In witness whereof, I have hereunto set my hand and seal the eleventh day of January, in the year of our Lord one thousand eight hundred and forty-seven.

D. W. GAUTIER. [L. S.]

Signed, sealed, published, and declared by the testator as and for his last will and testament, in the presence of us, who, at his request, in his presence and in the presence of each other, have hereunto subscribed our names as witnesses.

B. C. LEVERIDGE,
145 *CherrySt.*, *N. Y. City.*
JAMES APPLEBY,
113 *Pitt St.*, *N. Y. City.*

### TRUST DEED.

This indenture, made the eleventh day of January, in the year of our Lord, one thousand eight hundred and forty-seven, between Daniel W. Gautier of the city and State of New-York, gentleman, of the first part, and John Leveridge, of the same city, counsellor at law, and Hartman Vreeland, of Bergen, in the said county of Hudson, and State of New Jersey, gentleman, of the second part. Whereas Elizabeth Lewis, late of the city of New-York, widow, deceased, in and by her last will and testament, did give, devise and bequeath, unto the said party of the first part, and to his heirs, executors, administrators, and assigns forever, certain real estate hereinafter particularly mentioned, situate in the now county of Hamilton, formerly in Montgomery county, State of New-York, also certain real estate situate in the city and county of New-York hereinafter mentioned : also certain leasehold premises situate in the said city of New-York and hereinafter mentioned, and also certain personal estate : and whereas suits have been commenced relative to that part of the said real estate situate in the city of New-York, by parties who

claim to be entitled to the fee thereof in opposition to the said party of the first part, which suits are now pending undetermined, and it is probable other suits may be commenced relative thereto.

Now, therefore, this indenture witnesseth, that the said party of the first part, for and in consideration of the sum of one dollar, lawful money of the United States, to him in hand paid, by the said parties of the second part, at and immediately before the ensealing and delivery hereof, the receipt whereof is hereby acknowledged, and for the purposes hereinafter mentioned and expressed, hath granted, bargained, sold, released, conveyed and confirmed, and by these presents doth grant, bargain, sell, release, convey and confirm, unto the said parties of the second part, and to their heirs and assigns forever, All that certain tract of land situate in the now county of Hamilton, State of New-York (formerly in the county of Montgomery), being part of the Indian purchase, made by Edward and Ebenezer Jessup and their associates, under a license granted to Totten and Crossfield, and known and distinguished in a division of the said purchase into townships, by being the northernmost half of Township No. 1, and which half is bounded as follows, to wit: beginning in the southwest line of the said purchase, at the most southerly corner of Township No. 2, at a large birch tree marked with No. XIII. and No. I., for the most westerly corner of said Township, No. 1, and No. 2, for the most southerly corner of the said Township No. 2, and running thence south, thirty degrees east, two hundred and eighty-three chains and eighty links, then north sixty degrees east, four hundred and eighteen chains, then north thirty degrees west, two hundred and eighty-three chains and eighty-three chains and eighty links, then south sixty degrees west, four hundred and eighteen chains to the place of beginning. All which courses are run as the needle pointed in the year one thousand seven hundred and seventy-two: containing eleven thousand eight hundred and sixty-two acres, three

roods and twenty-four perches, be the same more or less : also all those several lots, pieces or parcels of ground, situate in the Fourth Ward of the city of New-York, taken together, commencing on the easterly side of Oliver Street, at a point distant one hundred feet from the northerly side of Cherry Street, thence running from said point easterly, on a straight line until it comes to land now or late of the estate of John G. Coster, deceased ; thence running southerly along the land, now or late of said Coster's estate, and on a line parallel with Oliver Street, to the northerly side of Cherry Street, thence running westerly along the northerly side of Cherry Street to Oliver Street, and thence running northerly along the easterly side of Oliver Street to the point, the place of beginning : also all those several lots, pieces or parcels of land, situate in the said Fourth Ward of the city of New-York, on the southerly side of Cherry Street, taken together, commencing at the southeasterly corner of Cherry Street and Oliver Street, thence running easterly along the southerly side of Cherry Street, to land now or late of the estate of John G. Coster, deceased, thence running southerly along the land now or late of the estate of the said John G. Coster, and on a line parallel with Oliver Street to the northerly side of Water Street, thence running westerly along the northerly side of Water Street to Oliver Street, and thence running northerly along the easterly side of Oliver Street to the place of commencement, which is the southeasterly corner of Cherry Street and Oliver Street : also all those several other lots, pieces or parcels of land situate in the said Fourth Ward of the city of New-York, on the southerly side of Water Street, taken together, commencing at the southeasterly corner of Water Street and Oliver Street ; thence running easterly along the southerly side of Water Street to land now or late of the estate of the said John G. Coster, deceased, thence running southerly along the land now or late of the said Coster estate, and on a line parallel with Oliver Street to the northerly side of South Street,

thence running westerly along the northerly side of South Street to Oliver Street, and thence running northerly along the easterly side of Oliver Street to the place of commencement, which is the southeasterly corner of Water Street and Oliver Street aforesaid : and also all that certain other lot of ground and premises situate on the northerly side of Beaver Street, between William Street and Broad Street, in the First Ward of the city of New-York, known upon the map (assessment) for widening and improving streets, in the First Ward of the city of New-York, by the No. one hundred and twenty-six (126), and assessed as the property of Eliza Lewis, R. L. Lord, lessee : the same being now under lease unto the said R. L. Lord : together with all and singular, the privileges, advantages, hereditaments and appurtenances thereunto belonging, or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof : and also, all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part, of, in and to the same, and every part and parcel thereof, with the appurtenances : To have and to hold the above granted, bargained and described premises, and every part and parcel thereof, with their and each of their appurtenances unto the said parties of the second part, their heirs and assigns, to their own proper use, benefit and behoof forever, to and for the uses, trusts, intents and purposes, hereinafter expressed and declared. And this indenture further witnesseth, that the said party of the first part, for the consideration and purpose aforesaid, and hereinafter expressed, hath sold, assigned, transferred and set over, and by these presents doth sell, assign, transfer and set over unto the said parties of the second part, their heirs, executors, administrators and assigns forever, all that certain indenture of lease, made and executed by the Mayor, Aldermen and Commonalty of the city of New-York, unto John Leveridge, bearing date the twenty-ninth day of December, in

the year one thousand eight hundred and forty, and recorded in the office of Register of the city and county of New-York, in *Lib.* 420 *of Conveyances, p.* 320, for all that certain lot of land, on the northerly side of Beaver Street, between William and Broad Streets, in the First Ward of the city of New-York, known on the map of a certain assessment, for widening and improving streets, in the (city of New-York) First Ward, by the number one hundred and twenty-six (126), and assessed as the property of Eliza Lewis (R. L. Lord, lessee), and also the assignment of the said indenture of lease, bearing date the third day of May, one thousand eight hundred and forty, made and executed by the said John Leveridge, unto the said Eliza Lewis, and recorded in the said office of Register, of the city and county of New-York, in *Lib.* 420 *of Conveyances, p.* 322 : and also the term of years yet to come and unexpired, of and in the said indenture of lease, and all the benefit and advantage to be had and derived therefrom : and also all bonds, mortgages, money, rents due and to become due, unto the said party of the first part, and particularly a certain bond and mortgage, made and executed by Henry P. Havens, of the city of New-York, unto the said Eliza Lewis, in her lifetime, and the principal and interest money thereof, due and to become due thereon, the same having been given and bequeathed unto the said party of the first part, by the said Eliza Lewis, by the name of Elizabeth Lewis, in and by her last will and testament; and also all debts, dues, claims and demands, of whatever nature and description, due and to become due, unto the said party of the first part, and also all personal property of whatever nature and description, belonging unto the said party of the first part, or in which he has any interest, and all personal property of whatever nature and description, given and bequeathed unto the said party of the first part, by the said Eliza Lewis, in and by her last will and testament, executed by the name of Elizabeth Lewis ; To have and to hold, all and singular, the said leasehold premises above described,

and the said indenture of lease and assignment thereof, and all and singular, the said bonds, mortgages, and other personal property above mentioned, unto the said parties of the second part, their heirs, executors, administrators and assigns; to, for and upon the uses, trusts, intents and purposes, hereinafter expressed and declared. And this indenture further witnesseth, that the same is made and executed, to, for and upon the following uses, trusts, intents and purposes, and to and for no other use, trust, intent or purpose whatever; that is to say, in trust, in the first place, that the said parties of the second part, and the survivor of them, take immediate possession of all and singular, the said real estate, leasehold estate and personal estate above mentioned, that they receive the rents, and interest, and income arising from and out of the same, and apply the same to the payment of the costs, charges and expenses attending the execution of the trusts hereby created, and a reasonable compensation for their services, in addition to what is allowed by law to trustees, executors, administrators and guardians; In trust, in the second place, that they also pay thereout, all debts now due and owing by the said party of the first part, and all just claims and demands now against the said party of the first part, and all taxes and assessments upon the said real and personal estate, of whatever nature and description, and also all costs, charges and expenses, including attorneys' costs and counsel fees, and legal charges in defending any suit or suits, that are now pending relative to said real estate, and that may hereafter be commenced relative thereto, by the said parties of the second part, and the survivor of them, and that may be commenced by any person or persons, who may claim any estate, right and title of, in and to the same, and any part thereof; and also all travelling expenses, costs and charges, and compensation for time in making any journey or journeys, relative to said real estate or any part thereof, and of any agent or agents, that may be employed by the said parties of the second part and the survivor of

them relative thereto ; In trust in the third place, that the said parties of the second part and the survivor of them, whenever they shall deem it expedient and in their judgment beneficial, sell and dispose of the whole, or any part of the said real estate, leasehold estate and personal estate, which sale may be either at private or public sale, and for cash or upon credit, or part cash and part credit, and upon such sale execute to the purchaser or purchasers thereof, a good and sufficient conveyance or conveyances, assignment or assignments therefor, and for such sums, or price or prices, as to the said parties of the second part and the survivor of them, shall seem just and proper; In trust in the fourth place, that the said parties of the second part, and the survivor of them, apply, if necessary, the proceeds thereof to the payment of the debts now due, owing and payable from the said party of the first part, and to the payment of all advances heretofore made unto him, by the said Hartman Vreeland, and to the payment of all the costs, charges and expenses, attorneys' fees, counsel fees, and legal charges of any suit now pending and undetermined, and that may hereafter be commenced as above mentioned, and to the payment of all expenses, costs and charges, that may be incurred under and by virtue of any of the trusts hereby created ; In trust in the fifth place, after paying out of the rents and income of the said real estate, leasehold estate, and personal estate, if there shall be sufficient for such purpose, all the said debts and all advances made, and that may be made unto the said party of the first part by the said Hartman Vreeland, and all costs, charges, legal expenses, counsel fees and other charges, costs and expenses attending the execution of the trusts hereby created, and if there shall not be sufficient for those purposes, then after paying the same out of the proceeds of the said real, leasehold and personal estate, to invest the balance remaining upon good and sufficient security, and the interest and income arising therefrom, to appropriate to his use and for his benefit, support and maintenance, and

the principal sum to keep so invested during his life : If there shall be sufficient of the rents, income and interest arising from the said real, leasehold and personal estate, without the same being sold to pay all above directed to be paid, then to appropriate to his use and for his benefit, support and maintenance, the balance remaining : And in trust in the last place, in case of the death of the said party of the first part, that the said John Leveridge, his heirs, executors and administrators, convey and assign over unto the said Hartman Vreeland, his heirs, executors, administrators and assigns forever, all and singular, the whole or such part of the real estate, leasehold estate and personal estate, as shall be remaining, to have and to hold the same unto the said Hartman Vreeland, his heirs, executors, administrators and assigns forever. The said parties of the second part, and the survivor of them, are hereby fully authorized and empowered to make, execute and deliver, any lease or leases, for the whole or any part of the said real and leasehold estate, for a term or terms of years, and when the same shall expire, to renew the same from time to time. And the said party of the first part, doth hereby for himself, his heirs, executors and administrators, nominate, constitute and appoint, the said parties of the second part and the survivor of them, and the heirs, executors and administrators of such survivor, his and their, true and lawful attorney and attorneys irrevocable, for all and every of the purposes of this indenture, and the trusts hereby created, to ask, demand and receive, all sum and sums of money, due, owing and payable unto the said party of the first part, and upon the receipt thereof, to give and grant, and as the act and deed of the said party of the first part, his heirs, executors and administrators, good and sufficient receipts, releases, satisfaction pieces, discharges and other acquittances therefor, and under seal if necessary : also to defend and prosecute, any suit or suits now pending relative to said real estate, and that may hereafter be commenced relative thereto, or any part thereof

and said leasehold estate, and that may hereafter be commenced relative thereto, with power of substitution and revocation, hereby ratifying and holding for firm and effectual, all and whatsoever shall be done by virtue hereof. And it is hereby expressly understood, that the said parties of the second part, and the survivor of them, and their heirs, executors and administrators, are not to be held liable or responsible for any act done by them in good faith, nor for the default or miscarriage of any attorney or agent, appointed by them or either of them. And the said parties of the second part for themselves, their heirs, executors and administrators, do hereby covenant, promise and agree to, and with the said party of the first part, his heirs, executors and administrators, that they and he will perform the trusts hereby reposed in them and him, according to the best of their skill and ability.

In witness whereof, the parties to these presents have executed the same in duplicate, the day and year first above written.

| Sealed and delivered in the presence of, | D. W. GAUTIER, | [L. S.] |
| | JOHN LEVERIDGE, | [L. S.] |
| | HARTMAN VREELAND, | [L. S.] |

The word " from," written over an erasure on tenth page only once. The words, " said party of the first part," interlined only once on the tenth page. The words, " said party of the first part," interlined only once on the eleventh page. The words " of the said party of the first part," interlined only once on the eleventh page.

Jos. E. PALMER.

*City and County of New-York*, ss. : On the eleventh day of January, 1847, before me came Daniel W. Gautier, John Leveridge and Hartman Vreeland, known to me to be the individuals described in, and who executed the fore-

going indenture, and they severally acknowledged to me, that they executed the same.

Jos. E. PALMER,
*Commissioner of Deeds.*

Recorded in the office of Register of the city and county of New-York, in *Lib.* 485 *of Conveyances, p.* 243, January 11th, 1847, at 10 minutes past 3, P. M.

Examined by HENRY ARCULARIUS, JR.,
*D. Register.*

GEORGE WOOD, M. S. BIDWELL, *and* J. W. C. LEVERIDGE, *for Executors.*

I. D. W. Gautier had testamentary capacity.

1. His habits of intoxication had not destroyed his mental powers, or impaired his capacity so that he had not full ability to do business or execute a will.

No *act* is proved to indicate the loss of his mind. The opinions of the attesting witnesses are explicit in favor of his capacity, and are corroborated by an overwhelming amount of concurring testimony, and the very witnesses who have been brought forward to establish his incapacity, not only are less qualified in respect to intimacy, former acquaintance, and discrimination of judgment, to form a judgment on the question, and were besides, from employment, association, or occasion, likely to see him chiefly in his hours of indulgence, but they themselves actually transacted business with him as a man who had full capacity.

2. He was not in a state of intoxication when he executed the will.

The subscribing witnesses, and also Mr. Palmer, and Mr. J. Leveridge, concur on this point.

And there is no evidence to the contrary. If he was badly intoxicated on the evening of that day, it is no proof

and it creates no presumption, that he was at all under the influence of liquor at the time when the will was executed.

II. The will was executed with all the formalities required by law.

There were two subscribing witnesses, in whose presence he signed and published the will, in the most express and formal manner, and who, at his request, signed their names as witnesses in his presence.

He not only expressly and formally published it, but he used to them both, one of the following expressions: " *I wish you to witness this will*," or, " *I have no objection to your witnessing this will*," either of which was a publication, and a publication *to* both of the subscribing witnesses. It is not important that all these facts should be recollected and proved by both of the witnesses.

III. D. W. Gautier gave the instructions for drawing the will.

It originated with him, and was suggested by him. It was *his* act, not the act of any body else.

Mr. Vreeland did not even know of it until after Mr. Gautier's death.

Mr. Leveridge, to whom Gautier gave the instructions, and who drew the will, was Mr. Gautier's counsel, not Mr. Vreeland's. He never acted for Mr. Vreeland individually, until this will was propounded for probate.

These facts are of themselves conclusive on the question as to this paper being the will of Gautier.

IV. There is no proof of undue influence, but the contrary.

There was on the part of Mr. Vreeland no importunity.

There was no deception or concealment.

The inventory of Mrs. Lewis's estate was filed in October, 1846 ; Dr. Robson was a party to it; and so far from there being the least reason to suspect a desire to conceal

it, it was filed several months before the will or deed was executed.

Gautier was a young man of leisure, and a student at law, and there is not the least reason to presume that he was ignorant that Mrs. Lewis had left him a large estate. People are never wanting to let a young man know or feel that he has had a fortune left to him.

He read the trust deed which particularly designated the real estate.

What pretence is there for charging Mr. Vreeland with concealment ?

As to undue influence by pressing importunity, there is not only no proof or semblance of proof of it, but on the contrary, on the only occasion on which he attempted to control Mr. Gautier, viz.,—as to his going to Mexico,—he failed, although backed by others, and that too at the very time when these instruments were executed.

The equity doctrine as to bargains between a guardian and ward, has no application to this case, not only because Mr. Vreeland was in no sense a guardian to Gautier (who, in fact, had the absolute ownership of his property), but also because there was no bargaining between them, no sale by Gautier for an inadequate consideration, or for any consideration. The deed, as well as the disposition by will, was a gift, and intended so to be, and was a purely voluntary act on the part of Gautier.

It was, moreover, prepared by Mr. Gautier's direction and instructions, after he had consulted counsel, and had obtained his opinion and advice.

And even assuming that the deed was improvident on account of its not containing any power of revocation, and would on that account be relieved against in equity in behalf of the grantor, if he had subsequently been married and had a family, yet that objection would not apply to the will, which is always revocable till the testator's death. The two instruments are separate and distinct, and not parts of one transaction, each having a separate, isolated

operation, and Vreeland being perfectly passive in regard to both of them, and totally ignorant of the existence of the will until after the death of the testator.

V. The deed did not operate as a revocation of the will.

1. Because from the time, and circumstances attending the execution, it was evidently not so intended.

2. Because not executed with the requisite formalities. (2 *Vol. R. S.*, 2d ed., *p.* 8, §§ 42, 45, 46.)

3. Because a conveyance of personal estate never revokes a will of personal property, so as to prevent probate.

VI. This Court has jurisdiction.

1. Because it appears from the evidence that Gautier left assets here. The will of Mrs. Lewis, and the inventory of the executors of it, show personal estate left to Gautier exceeding $40,000. There was, besides, a large amount of real estate mentioned in the deed of trust, and also leasehold estate.

By that deed the whole of the income of the real, leasehold, and personal estate was appropriated to Gautier's benefit, and belonged to him during his life.

From these facts it is apparent that, there must have been in the hands of the trustees, beyond all sums paid to him by Vreeland, some assets. One of these trustees resides in this city, and a considerable part of the real estate is situate in this city. Several of the debtors by bond and mortgage reside here, and the lands mortgaged are also situate here. There is no proof and no legal presumption that the assets belonging to Mrs. Lewis's estate, and which were subject to the jurisdiction of this Court, had been removed. There were assets, therefore, within this county.

2. One, at least, of the trusts as to the real estate to be executed during Gautier's life, and all the trusts as to the personal estate are valid, and the conveyance therefor to the trustees vested in them a legal estate during Gautier's

life, but it was limited to Gautier's life, and at his death it ceased, and then Mr. Leveridge had a valid power in trust, viz., to convey, after all debts and expenses should be paid, the land to Mr. Vreeland, and, therefore, the land and the beneficial interest would have thereon descended, if Gautier had left no will, to his heirs at law, liable only to be displaced at a future period by the exercise of that power. The devise, therefore, took effect subject to be displaced by the execution of the trust power. It was not a case where the remainder was conveyed to Mr. Leveridge in trust for Mr. Vreeland, so that the trust was rendered nugatory, and the remainder vested at once in Mr. Vreeland.

1. Because there is no conveyance to him of the legal estate for such a trust.

2. If there had been, there was no statutory execution of the trust, and there could not be until the trust was satisfied, nor until all the debts and expenses, &c., were paid.

There was not an equitable conversion of the realty, out and out, into personalty. The trustees were not to sell at all events, but only in case it should be necessary (of which there was no probability) to pay debts.

Mr. Gautier's will, therefore, was an operative and effectual devise of land situate in this county.

3. But it is sufficient that Mr. Gautier's *will* contained a devise of lands so situated, that is, that such lands were designated, and his intention to devise them expressed in the will in suitable and sufficient terms for that purpose. Such a provision is a devise within the meaning of the statute.

It was not intended by the law, that this Court should decide whether he had a good and devisable title to those lands, either at or after the date of the will. Such an inquiry would, in many cases, involve most abstruse and difficult questions, for which such a Court is ordinarily not at all suited. If the case of *Brown* vs. *Thorndike*, establishes a contrary doctrine, it ought not to be adopted; but

when carefully examined, it will be found that it does not. In that case, the only question was, whether an unattested revocation would be sufficient in a case where the testator owned no real estate in Massachusetts, and had, after the execution of the will, conveyed all the interest in the real estate in Maryland. There was no statute in Massachusetts requiring a revocation of a will of personal estate to be attested, but to revoke a devise of real estate, an instrument attested by three or more witnesses was necessary. It was argued that, as the law of Massachusetts declares that a will of real and personal estate not duly attested to pass real estate, should not be allowed as a will of personal estate, by parity of reasoning, a revocation of a will of real and personal estate, would not take effect as to the personalty, unless attested so as to take effect as a revocation of a devise of land.

The Court decided that this rule was not established by the letter of the law, and that in a case where it must be presumed that the testator knew at the time he executed the revocation, that he no longer had any real estate, and that the will, therefore, could only take effect as a will of personal estate, an unattested revocation was sufficient to revoke it.

They further held, that when from equivocal words, it was doubtful whether the testator intended to give real or personal estate, or both, the Courts of Probate should allow evidence to show that the testator, when he made his will, had no real estate.

This is the substance of the doctrine laid down in that case.

VII. There is nothing in this will incoherent or irrational.

From the relations, intercourse, and affection between Mr. Gautier and Mr. Vreeland, both before and after Mrs. Lewis's death, and from those which had existed between the latter and Mr. Gautier's father, the disposition of the

property contained in the will was such as might have been expected. And that they were such as he intended to make, is evident from the testimony of Mr. Van Orden and Dr. Robinson, and it may be added, there is no reason to suppose Mr. Gautier ever regretted, or had any cause to regret his having confided in, and trusted Mr. Vreeland as his best friend. There is no doubt that the will truly expresses Mr. Gautier's deliberate intention and purpose, and it furnishes no one with any reasonable ground to complain or be surprised that he preferred one who had been his *father's friend*, and *his best friend*, to relations with whom he had never been intimate, and to whom he owed no obligations.

HENRY S. DODGE, *for Heirs.*

I. There is no sufficient proof of execution of the paper.

1. There was no request to Appleby to be a witness.

2. There was no declaration or publication, at least, to or in the presence of Appleby.

3. There was in fact but one attesting witness, viz.: B. C. Leveridge, the other witness, John Leveridge, did not attest.

4. The *onus* being on the propounders, it is not enough to leave the matter *in doubt*. (*Rutherford* vs. *Rutherford*, 1 *Denio*, 33; *Brown* vs. *De Selding*, 8 *Leg. Obs.*, 224.)

5. It was neither signed nor acknowledged in the presence of *two* witnesses, because if there ever was any request to Appleby, it was afterwards. (*Chaffee* vs. *Baptist Convention*, 10 *Paige*, 85.)

II. The Surrogate has no jurisdiction of this case, because the decedent was not an inhabitant of this State (*Petition*), and there is no allegation or proof that there were any assets in New-York, or that the Surrogate of Hamilton or some other county, had not gained jurisdic-

tion, or that there was any real estate in New-York de-vised by the will, if valid.

1. For all the real estate described in the will, was conveyed by the deed (*Ex. A*), and thenceforth the will, if not entirely revoked, became a will of personal estate only. (*Brown* vs. *Thorndike*, 15 *Pick.*, 388, *and vide the next point.*)

2. There is no proof or allegation, that the real estate mentioned in Ex. A, has not been all sold to pay debts, &c. (*Adams* vs. *Winne*, 7 *Paige*, 97.)

III. The paper (if a valid will) was wholly revoked, both as to the personal and real estate, by the Deed Ex. A, which was executed after it.

1. The testator being a resident of New Jersey, his will as to personalty, is governed by the New Jersey law. (*Story on Conflict Laws*, § 468, *&c.*; *In re Easton's Will*, 6 *Paige*, 183.)

2. By the New Jersey law, which is substantially the law as it stood here before the Revised Statutes (*vide* the cases and statutes in evidence), the deed absolutely re-voked the will. (*Beard* vs. *Beard*, 3 *Atkins*, 72; *Henfrey* vs. *Henfrey*, 2 *Curteis*, 468.)

3. The result is the same, if the New-York law since the Revised Statutes be applied, because the executed Deed Ex. A, is a disposition of the whole property upon the death of Gautier. (2 *R. S.*, 65, § 47; *Adams* vs. *Winne*, 7 *Paige*, 97.)

4. The clause in *Ex. A, fol.* 350, 351, is a direct con-veyance of the reversion of all the real estate, which should remain at the grantor's death, and of all the personal pro-perty, to Vreeland,—it would have passed not only the beneficial but the legal estate, before the Revised Statutes. *Bull* vs. *Vardy*, 1 *Ves. Jr.*, 271.) But since the Revised Statutes, there can be no question of its effect. (1 *R. S.*, 727, §§ 45, 47, 49; *Root* vs. *Stuyvesant*, 18 *Wend.*, *at p.* 266 *and* 278; *Salmon* vs. *Stuyvesant*, 16 *Wend.*, 324, 331; *Welch* vs. *Allen*, 21 *Wend.*, 147; *Lagrange* vs. *L'Amoreux*,

1 *Barb. C. R.*, 18 ; *Wait* vs. *Day*, 4 *Denio*, 439 ; *Nicoll* vs. *Walworth*, 4 *Denio*, 386, 391.)

5. At all events, this paper cannot be proved as a will of real estate. The devise is confined specifically to the real estate left him by Mrs. Lewis, and would not pass after acquired interests in real estate, if there were any. (*Pond* vs. *Bergh*, 10 *Paige*, 140.)

6. That the Surrogate must pass on the question of revocation, *vide Nelson* vs. *McGiffert*, 3 *Barb. Ch. R.*, 158.

IV. Upon the evidence it is clearly established,

1. That the decedent was an habitual drunkard.

2. That his mind was seriously impaired, so that at least he was of weak and fluctuating capacity.

3. That he was under the influence of liquor at the time, and on the day of the execution of the paper.

4. That he was wholly in the power of Vreeland, dependent on him for the smallest sums, and entirely under his control, and that Vreeland had possession of all his property, and never had given him any account or information as to its value.

5. That the will was executed immediately before the deed, and with a full knowledge (if any knowledge at all) that the deed was to follow.

6. That the will and deed were drawn by Vreeland's counsel, without the knowledge of Gautier's counsel, and without the knowledge of any of his relatives or friends.

7. That the execution was obtained by Vreeland's advancing the money Gautier wanted to take him to Mexico, and that Gautier would have signed any thing for that money.

8. That Vreeland knew Gautier's infirmity, refused to let him deal with others, encouraged him in his intemperance, and kept him wholly under his own control, until he got the papers executed.

9. That the deed and will, were both obtained by fraudulent and undue influence.

V. The *onus* is on Vreeland to support the trans-

action, by showing the fullest knowledge and deliberation in Gautier, Vreeland being in the situation of a guardian, in full possession of the ward's property, with the ward wholly under his influence and control.

THE SURROGATE. The first point for consideration, relates to the jurisdiction of the Surrogate of New-York to take proof of this will. The deceased was an inhabitant of the State of New Jersey, where he died. The petition is defective in not stating the facts requisite to give jurisdiction, but it was conceded on the argument, that it might be amended, provided the facts which ought to have been stated in it, appeared from the evidence. It is not proved that the decedent died leaving assets in this county, or that since his death, assets have come here. Nor does it appear that the Surrogate of any other county has gained jurisdiction. I have therefore no authority to take proof of the will, as a will of personalty on the one hand; nor on the other am I excluded from taking proof of it, as a will of real estate, provided in the words of the statute (2 *R. S.*, 3*d ed.*, *p* 26, § 46, *Sub.* 5), " any real estate devised by the testator, shall be situated" in this county. Where a devise is general, without particular specification or description, it may not only become necessary for the Surrogate to ascertain that the subject of it lies within his county, but if that is controverted, to hear testimony and determine the fact before admitting the will to record. On that point, I do not wish to express an opinion, the case not requiring it. But where a will on its face purports to devise real estate in the county, shall the Surrogate try an issue as to the testator's title, as a preliminary to the proof of the will? This is not required by the letter of the statute. The jurisdiction is made to depend upon the situation of real estate " *devised*" by the testator. This cannot mean *a valid devise*, for the very object of the proceeding is to ascertain that fact, and it could not, therefore, be required as a pre-

requisite to jurisdiction. Nor does the statute put the jurisdiction, upon the situation within the county of real estate *owned* by the testator. And yet, that is what the contestants really insist upon. The power to take proof of the will is not based on the *title* of the testator, but on the *devise* he is claimed to have made, and I think the requisitions of the statute are fully met, by a will purporting on its face to devise real estate situated in the county. The will propounded for probate, contains a devise in these words : " I do give, devise and bequeath, unto Hartman Vreeland, &c., all my real estate situated in the county of Hamilton, State of New-York : Also, all my real estate situate in the city of New-York, on Oliver Street, Cherry Street, Water Street and South Street, in the Fourth Ward of the said city of New-York : Also all other real estate situate in the city of New-York, and in any other place or places belonging to me : Also, all the real and leasehold estate belonging unto me situate in Beaver Street, in the said city of New-York ; the said real estate and leasehold estate, being devised and given unto me, by Elizabeth Lewis, now deceased." The practical effect of the doctrine, that the ownership of this property may be disputed, as material to jurisdiction, may be seen from the fact, that the counsel for the contestants relies upon a trust deed executed by the decedent, the same day of the execution of the will, to show that the very real estate mentioned in the will and claimed to be devised, was conveyed by the deed, and that the decedent had no real estate in the county at the time of his death. The counsel for the executor contends on the contrary, that under a proper construction of this trust deed, there remained in Gautier, the grantor, a legal estate in the reversion, subject to the execution of a power by one of the trustees, after his death. In the view I take of the statute, it is not necessary for me, as to this branch of the case, to pass upon the effect of the trust deed, the authority of the Surrogate to take proof of the will and admit it to record, being grounded, not upon the title

or ownership of the property, but upon the presentation of a will, purporting on its face to devise real estate in this county. (See 2 *R. S., p.* 318, § 1, *Sub.* 1.)

It was also urged on the argument, that if the will was validly executed, it was revoked by the conveyance made by the decedent, on the same day, of all the property described in the will. So far as intention is of importance, which, before the Revised Statutes, was a criterion in cases of implied revocation, there can be little weight in the objection, for it cannot be seriously contended, that a will and a deed, executed almost, if not quite, simultaneously, and as to their general purport, in harmony with each other, so that they may fairly be considered as parts of the same transaction, are notwithstanding, to be construed in such a way, that the deed is to nullify the will, on the ground that it shows an intention to revoke a solemn act, just consummated a few minutes before. The reasonable conclusion would be just the other way; namely, that instead of contemplating a revocation of the will giving the estate to Vreeland after his death, by a trust deed securing the same estate to Vreeland on the same contingency, the instruments, if valid, were both intended together, to be a complete and effectual disposition of the decedent's entire property in favor of Vreeland, by a double mode of assurance. The Revised Statutes have undertaken to dispose of the whole subject of implied revocations. The Revisers in their notes, justly remark, that the " arbitrary rules and subtle refinements" on the doctrine of implied revocations, had proceeded to such a degree as to be " a fruitful source of difficult and expensive litigation," and " to be constantly applied, not to carry into effect, but to defeat the intention of testators." In suggesting amendments to the existing law, they refer to a case somewhat similar to the present. They say, " But we have not yet reached the climax. A conveyance or assurance after the publication of a will, defeats the will, although made with the avowed intent of confirming it. A man made a will and devised

certain estates to persons named therein ; he afterwards, by deed, conveyed the same lands to trustees for the use of the persons named, and for the purposes declared in his will ; and it was held, for a technical reason, that the will was revoked by the very act that recognized its existence, and was designed to establish it. (*Hussey's Case, Moore's Rep.*, 789 ; *Ambler*, 215 ; 3 *R. S.*, 2*d ed.*, *p.* 632.)   The 39*th Section*, 2 *R. S.*, 3*d ed.*, *p.* 125, recognizes the old rule of the Common Law, as to the effect of a subsequent conveyance or alteration of the estate of the testator, to the extent, that where his estate or interest in property previously devised, or bequeathed, is " wholly divested," the conveyance may operate as a revocation ; providing, however, that where the estate or interest is not " wholly divested," it shall not operate as a revocation, unless in the instrument by which such alteration is made, the intention to revoke is expressly declared. The succeeding section (40) also provides, that if the provisions of the instrument by which such alteration is made, are wholly inconsistent with the terms and nature of such previous devise or bequest, such instrument shall operate as a revocation thereof, unless such provisions depend on a condition or contingency, and such condition be not performed, or such contingency do not happen.   The provisions of the trust deed executed by the decedent at the same time the will was made, are not inconsistent with the will, but in harmony with it,—nor can it be strictly said, that his estate and interest in the property previously devised, was wholly divested, for he not only retained a beneficial interest for life therein, but a power was given to one of the trustees to be executed after his death, subject to the execution of which, the estate of the grantor would descend to his heirs or pass to his devisees.   I have had some doubts, whether the sections of the statute referring to the revocation of " *devises and bequests*," as distinguished from those relating to the revocation of " *wills*," were not intended for the guidance and direction of Courts of Construction, and not for the Probate Court ; but that

point is not material for determination, in the view I take of the construction of the 39th and 40th Sections, in their connection with the provisions and design of the deed of trust. And if I have erred in the opinion, that the trust deed did not " wholly divest" the decedent of his estate and interest in the property devised, it has only led to the disposition of the case on its merits, independently of a technical rule.

I approach, then, the real substance of the controversy. As to the execution of the will, I think the essential ceremonies required by the statute were substantially performed, and shall, therefore, pass without delay to the evidence offered to impeach the capacity of the decedent, and to establish the exercise of undue influence over him, by the proponent Vreeland. The decedent was an orphan from infancy, his father having died before he was born, and his mother when he was two years old. From that time, he was taken in care and brought up by Mrs. Lewis, a distant connection, with whom he resided or made his home until her death, in February, 1846. She left him by her will, a large estate in the city of New-York, producing an income of between three and four thousand dollars a year. Mr. Vreeland and Dr. Robeson, were appointed executors, but the latter took no active part in the management of the estate, while the former was the acting executor, collected the rents, and had the general charge of affairs. Mr. John Leveridge, who had been Mrs. Lewis's counsel in her lifetime, for many years, continued to act as counsel for the executors, and particularly for Mr. Vreeland as executor. The decedent received no part of the rents of the real estate, the interest or principal of the personalty, except through Mr. Vreeland, and the accounts of the latter as executor never were settled. On the eleventh day of January, 1847, Gautier executed at Mr. Leveridge's office, the instrument propounded as a will, wherein he devised and bequeathed to Mr. Vreeland, the whole real and personal estate, given him by Mrs. Lewis's will,*—and at or about

the same time, in conjunction with Mr. Vreeland and Mr. Leveridge, he also executed a deed, by which he conveyed his whole estate to them in trust (after paying Gautier's debts, the expenses of managing the property, and of certain ejectment suits which had been brought for its recovery against Gautier), to appropriate the income to Gautier's use and benefit for life, and on his decease, for John Leveridge to convey the same to "Hartman Vreeland, his heirs, executors, administrators and assigns forever." The deed and will were drawn up by the counsel for the executor, and gave the entire bulk of the estate, after Gautier's decease, to the executor, when still in the active management of the estate, and never having accounted with the *cestui que trust*. Such a transaction cannot be supported without very satisfactory evidence of its entire fairness. By the civil law, if a person drew a will in his own favor, it was void (*Dig. Lib.*, 48 ; *Lib.*, 34.), in conformity to an ordinance under Claudius, that the writer of another's testament, should not mark down a legacy to himself. (*Suet. Ner.*, 17.) The principle of this rule is applicable to all cases of testamentary procurement, especially where the parties obtaining the will are in fiduciary relations with the testator ; but without adopting it in all its extent, the reason of it is suffered so far to prevail in our own law, that Courts regard the circumstance as creating a presumption against the act, and rendering necessary very clear proof of volition and capacity. Sir John Nicholl, in collecting the cases bearing upon the effect of the existence of such fiduciary relations between the parties, as guardian and ward, client and attorney, principal and agent, trustee and *cestui que trust*, in the elaborate judgment which he pronounced in *Ingram* vs. *Wyatt*, 1 *Hagg.*, 385, says, these cases "show, how extremely jealous the law is to protect the unwary against undue influence and control. Where that relation of confidence exists, and where the party frames the instrument for his own advantage and benefit, every presumption arises against the transaction.

As in the case of an interested witness, it is not necessary to prove falsehood,—a Court of law will not hear him at all,—so in the case of such an executor, it is not necessary to prove fraud and circumvention ; he must remove the suspicion by clear and satisfactory proof." This case was reversed on appeal, not for error in law, but on the ground that the facts disclosed in evidence, established capacity and volition, and sufficiently rebutted the suspicion arising from the fiduciary relations of the parties, the testator and the executor. (3 *Hagg.*, 466 ; *vide Walmsley* vs. *Booth*, 2 *Atkyns*, 25 ; *Cray* vs. *Mansfield*, 1 *Vesey, sen.*, 379 ; *Oldham* vs. *Hand.*, 2 *Id.*, 259 ; *Gibson* vs. *Jeyes*, 6 *Vesey*, 266 ; *Coles* vs. *Trecothick*, 9 *Vesey*, 246 ; *Hatch* vs. *Hatch, Id.*, 292 ; *Huguenin* vs. *Baseley*, 14 *Vesey*, 273 ; *Griffiths* vs. *Robins*, 3 *Madd.*, 191 ; *Paske* vs. *Ollat*, 2 *Phill.*, 323 ; *Billinghurst* vs. *Vickers*, 1 *Phill.*, 193 ; *Countess of Portsmouth* vs. *Earl of Portsmouth*, 1 *Hagg.*, 366.) In *Middleton* vs. *Forbes*, 1 *Hagg.*, 395, a deed had been procured from the testator, subsequent to the execution of the will, and though the circumstances were much different from the present case, as to the interval that elapsed between the execution of the two instruments, and especially as to the fact, that the deed had been set aside for fraud, before the will was propounded, yet the remarks of the Judge, Dr. Calvert, in respect to the mutual bearing of the two instruments, are not unworthy of attention in this connection. He said, " a deed is also obtained for the same purpose, and though the setting aside the deed does not establish fraud (with regard to the will), yet it is a controvertive circumstance. The ineptitude of such a bargain, might be a sufficient ground to set aside the deed, but not the will, which does not take immediate effect. Yet, the obtaining such a deed, does come strongly to corroborate the fraud of the will ; it shows that the testator was liable to imposition, that he executed a deed which he ought not to have executed, and that the Middletons obtained a deed they ought not to have obtained ;" " they show that they

thought the deceased liable to imposition, otherwise they would have trusted him and not got the deed. They were afraid of the continuance of his affection, lest he should fall into other hands." It is impossible to read the testimony in the present case, without regarding the will and the trust deed, executed by Gautier on the 11th of January, 1847, as a single transaction. By the will, the estate he derived from Mrs. Lewis was given on his decease to Vreeland, and the latter, in conjunction with Mr. Leveridge, were appointed executors. By the deed the same disposition was made, or rather secured, and Mr. Vreeland and Mr. Leveridge were appointed the trustees. Both instruments were drawn by Mr. Leveridge, and executed almost at the same time. Mr. Vreeland was required to be there to sign the deed as a necessary party, and he was there. The concurrent presence of all three was requisite, and it took place. Mr. Vreeland attributes his attendance at the office to "some little business with Mr. Leveridge;" denies all knowledge of the will, and says, "I did not know this deed was going to be executed that day before I went to Mr. Leveridge's office. I first heard of the deed when I got there. That was the first time that I heard that there was going to be a deed drawn." "I had no conversation with him (Gautier) at Mr. Leveridge's office before the deed was executed, that I recollect. I never talked with him any where else on the subject of the deed, to my recollection." "Before I went there that day, I had no reason to believe, nor did I know or believe that he was going to execute a deed of trust." Gautier was to leave the next day in a steamer for New Orleans, and after the deed was executed, Vreeland gave him in Mr. Leveridge's office the greater part of $500 in bank bills, and the rest at his store the next day. He says, "I had made no arrangement to give Gautier this money before I went to Leveridge's office. The arrangement as to the money was made at Mr. Leveridge's office." "Gautier told me then he was going to New Orleans, and he wanted $600, and I must

let him have it. He said he had engaged his passage with a parcel of gentlemen, who were going out, and I must let him have the money. I told him he had better stay and not go there. He said he had engaged his passage with those gentlemen, and must go, and would go. Those gentlemen were going, and he had agreed to go with them. That was all he said. I said nothing further in reply. I tried to persuade him not to go, and he said he would. Then I handed him the money. This was all after the deed was executed." Again, " Gautier before that day never asked me for money to go to New Orleans with. He had not talked with me before that day on the subject of going to New Orleans. I think that day was the first I heard of his going to New Orleans." " I first saw Gautier on the day this deed was executed in Mr. Leveridge's office. I do not recollect that I saw him on that day at any other place except there at Mr. Leveridge's office. I cannot say whether I saw him the day before the deed was executed, or what was the last time I saw him before the day the deed was executed. I first saw him at Mr. Leveridge's office that day, about one or two o'clock, or perhaps later. I do not remember the exact time. I was in the habit of going to Mr. Leveridge's office almost every time I came in the city, on account of the business he had on hand." Again, " I did not call at Stelle's under the Museum for Gautier the day the deed, Exhibit A., was executed. I never saw him at Stelle's but once, and that was after he came from New Orleans ;" " I never saw him at that place but once or twice. This was after he returned from New Orleans. Then I stopped at Stelle's for him at his request, to take him with me to my house. He asked me to stop there for him in the morning. I am sure I never saw him there before he went to New Orleans. I never knew Mr. Stelle before Gautier went to New Orleans, except that Stelle came to me with a small bill against Gautier. This was a few days before Gautier went to New Orleans. I accepted the bill, and paid it about

two weeks after Gautier went. This was the first time I knew Stelle."

It is thus quite apparent that Mr. Vreeland makes a thorough denial of any knowledge, previous to the 11th of January, of Gautier's intention to go to the South, and to make the deed of trust, and likewise of any concert of action or previous arrangement in regard to the meeting at Mr. Leveridge's office, and the payment of the money. He also denies any knowledge of the execution of the will till after Gautier's death. To get a clear view of the accuracy of these statements, it is necessary to take the matter up from the beginning. Towards the close of the year 1846, the decedent formed the design of going to Mexico, where hostilities were then existing, and seems to have made an effort to enroll a company to go with him. The affair ended in a determination to proceed to the South, and about the beginning of January, 1847, he took measures to prosecute this plan. Money, of course, was the primary requisite, and his uncle Vreeland the person to apply to. At that time Mr. Vreeland was in business in the city of New-York, and came to the store every day, except Sunday and Monday. He had been absent at Trenton for some time, and thinks he returned a day or two, or three, before the deed was executed. He does not recollect whether or not he saw Gautier after his return, before he met him at Mr. Leveridge's office on the 11th of January.

Mr. Robinson, a witness called by the executors, states that Gautier stayed at his house near New Brunswick, in January, 1847. " He wanted to leave to execute papers at New-York of great importance, he said, but there was a heavy snow-storm, and he could not leave. Friday he left. I took him down to New Brunswick. He said he had some papers to execute that day, that he must come. I saw him into the 12 o'clock cars for New-York." He said he was going to Mexico, spoke of his uncle, Mr. Vreeland, as one of the only " two real friends" he ever had,

said that "he had, or was going to make his will," and "his intention was to leave the whole of his property to his uncle who had been so kind to him." Previous to this Gautier had been staying at a public house in New Brunswick several months, and had made an effort there to get up a company for Mexico.

Mr. Van Norden, another witness called by the executors, states that he met Gautier on the Jersey City ferry-boat, in January, 1847, the Sunday afternoon prior to his sailing for Mexico, and he told him "that his uncle Hartman had used his influence to prevent his going," and when asked about his lawsuit, said in reply, "about his property, that was all fixed right."

Mr. Embury, a witness called by the executors, says that "for three or four days before he went" to Mexico, he met Gautier every day at Mr. Vreeland's store in Vesey Street;" "Vreeland was at the store some of the times during the last three or four days when I met Gautier there. I may not have seen Vreeland at all then. It may have been within a week or two; but I think I saw Vreeland once. Gautier, a day or two previous, asked me to ride down to the ship with him; asked me whether I would not see him off to New Orleans. Two or three days before that he talked about going to New Orleans, but not in the presence of Vreeland to my knowledge. Vreeland told me he was going, after it had been arranged that he should go. This might have been within the week before he went. I understood Vreeland was to furnish the funds. All that Vreeland said was, that he was going to New Orleans, and I think he said he would furnish the means."

Mr. Demarest, called by the executors, was, in 1847, a partner of Vreeland, and he says, "I recollect when Gautier went off to New Orleans or Mexico: within a week before that I saw him in Vreeland's store. I think Mr. Vreeland said he was going to give Gautier some money; he wanted to go away, he said, to New Orleans, I think.

Gautier said he was going to Mexico. I should not think it was a week before Gautier left, Vreeland told me this."

Mr. Stelle, a witness called by the contestants, says, that the decedent was in the habit of coming to his refectory; he boarded in the summer of 1846, with witness's brother at New Brunswick, came to New-York very often, ate and sometimes slept at his house. He says, "He was at my refectory the day before he left in the steamer. I know Hartman Vreeland. He was at my refectory, I think, the day before Gautier left. He had also been there a number of times before that, I do not recollect how often. Vreeland and Gautier were at my refectory together, the day before Gautier left. I did not notice their business, nor what they were doing together. I think they took a drink together. This was about twelve o'clock; it might have been a little after or before; it was about the middle of the day." Again, "He (Gautier) told me his uncle Vreeland was to let him have money, had promised him money to go to Mexico. Mr. Vreeland told me Gautier had been after him for money to go to Mexico with. He was opposed to his going, said he had tried to persuade him out of the notion of going, and requested me to do the same thing. This was only a few days before Gautier left. He said he should have to raise money, for Gautier was determined to go;" "the day before Gautier sailed, I saw Vreeland and Gautier go away together from my house in the morning; this was the middle of the day." "When Gautier and Vreeland left my place, about 12 o'clock the day before Gautier sailed, Daniel had been drinking a good deal, and was a little excited with liquor. Gautier came back to my house that day about sundown." Mr. Stelle had a bill against Gautier, which Vreeland accepted, January 9, 1847. Vreeland says, "The amount of the bill was $34. It was an order on me by Gautier. I don't know what it was for. Gautier came down and said it was all right." Mr. Stelle also states that he thinks Gautier went with

him, that he asked him to walk down to Vreeland's store, where he presented the order.

Mr. Newell testifies that he saw Vreeland at Stelle's, the day Gautier left, and once before. That a short time before Gautier left, he went with him to Mr. Vreeland's residence at Bergen, as Gautier said, " to arrange money matters for going to Mexico." On reaching Vreeland's house, there was a conversation between them, Vreeland urging Gautier not to go, and the latter saying he would. " I heard Vreeland observe," he says, " that if he must go, or was determined to go, he must furnish him with the capital." Freligh, another witness, fixes this visit on the 11th of January, but why he is so accurate as to the date does not appear. The time of leaving he puts at 4 or 5, P. M., which is hardly consistent with other circumstances.

Mr. John Leveridge states that Gautier called on him some two or three days before the deed was executed, and said " he was going to Mexico," that " he had been in pursuit of his uncle" to Trenton, and missed him ; " he then returned to the city, and saw Mr. Vreeland." He is quite certain that the day the deed was executed, Gautier came alone to the office, and thinks that the deed was executed after the will. Mr. Benjamin Leveridge, a witness to the will, thinks Mr. Vreeland was present at the execution of the will, that he was in the office when Gautier came in, and though he cannot be positive, thinks they came together. Mr. Appleby, the other subscribing witness, thinks he stayed there till Gautier went away. He did not know Mr. Vreeland, nor recollect seeing him there when the will was executed. Mr. Palmer, the witness to the deed, and who took the acknowledgment, recollects that Mr. Appleby was present at the time. Mr. John Leveridge thinks the decedent left in the steamer that afternoon or the next day. Mr. Vreeland puts his departure on the 12th or 13th, and the probability is that it was the former date. Several witnesses prove that the evening before he left he was at Stelle's, in possession of several

hundred dollars, and a good deal in liquor, so that his friends prevailed on him to leave the money with Stelle till the next day. Stelle says he came back to his house that day about sundown.

The eleventh of January, 1847, was on Monday, a day on which, at that time, Mr. Vreeland was not in the habit of coming to the city. The day before, Sunday, Gautier, on the ferry-boat, told Van Norden that his uncle had used his influence to prevent his going to Mexico, and the day before that, Saturday, when Stelle's order was accepted, Gautier and Vreeland met at the store in Vesey Street. If Gautier sailed on the 12th, the eleventh was the day he left Stelle's, after drinking somewhat, about noon, in company with Vreeland. The deed was recorded ten minutes past three o'clock that day. Is it more probable that Mr. Vreeland was at Mr. Leveridge's office with four hundred dollars in his pocket on the 11th of January, the day before Gautier was to sail, without any previous knowledge that Gautier was going to the South, and was about to execute a deed of all his estate; or, on the other hand, that he attended there to execute a deed to which his signature was necessary, in consequence of previous arrangement and consultation, with a full knowledge of the intended departure? And apart from the natural probabilities arising from the circumstances, which alternative is most in harmony with the evidence? I am constrained to say, that the proof leaves no doubt in my mind that Mr. Vreeland was cognizant of Gautier's intended departure, and that the disposition of his property was arranged to take place the day the deed was executed. I feel bound, however, in this connection to say, that Mr. Leveridge does not appear to have participated in the matter, otherwise than by receiving his instructions from Gautier, drawing the deed and the will, and attending the execution. He received his instructions as to the deed and the will from the decedent, and so far as that goes, it tends to show volition. But what the particular instructions were, what the occasion or necessity

of the deed was, how it came to be made, why the will
was made, at whose suggestion the whole transaction
originated, what the previous negotiations or conferences
were,—all these things are unexplained. Vreeland's state-
ment darkens instead of enlightening the case. One bold
feature stands out prominently, the decedent wanted money
to go to Mexico, was to sail the next day, and procured the
amount on the heel of a will and a deed, which gave his
entire estate to his uncle after his decease. The will and
the deed were executed so nearly together, that one wit-
ness to the will thinks Vreeland was there when it was
signed, and the other witness was still in the office when
the Commissioner came to take the acknowledgment of
the deed, and immediately after the deed was executed,
the money was paid and the transaction terminated.

Though I am of opinion, notwithstanding his intem-
perate habits, that the decedent possessed sufficient ca-
pacity to execute a valid testament, yet there can be no
doubt that his excesses had been carried to a degree which
must have impaired the vigor and tone of his mind. After
Mrs. Lewis's death, in the summer and fall of 1846, he
seems to have abandoned himself to gross intemperance.
In August he made a trip in a yacht to Newport, and
" was drunk all the time he could get liquor." While at
New Brunswick, he was a " free drinker," " frequently
unnerved with liquor ," in the morning before he drank
" very tremulous," so that " his hand would shake in lifting
a glass." Stelle says, " when he was at my house he was
generally under the influence of liquor." " I have seen
him take liquor to bed with him ; a glass of brandy along
side of his bed. I have observed him in the morning be-
fore he had taken anything. He was very nervous in the
morning until he got something to drink." It is urged,
however, that in spite of this mode of life, the decedent
was in the full possession of all his faculties. Drunken-
ness is a species of temporary insanity, and except when in
a state of intoxication, the capacity of the man is not de-

stroyed. But there can be no question that the general
strength of the mind becomes seriously affected by con-
tinued intemperance. This young man was not of strong
constitution, and he ultimately fell a victim to this dread-
ful vice in the morning of his life, in the 27th year of his
age. The power of resisting influence depends upon the
vigor of the understanding, and a man who abandons him-
self to the course of life which the decedent led, shows an
utter want of those qualities which insure independence of
character, and freedom from undue control. Without a
stated profession or occupation, leading a roving life, at one
time in South America, again at home, gunning, fishing,
yachting, drinking, he appears to have been totally desti-
tute of steadiness of purpose, or sobriety of judgment, and
to have given himself up to frivolity and dissipation. Such
persons, from their pecuniary necessities, are generally
most subservient to those who can supply their wants.
Depraved tastes, and expensive habits, constantly demand
pecuniary aliment; and however showy or brilliant may
be the talents, the man who has submitted to the ascend-
ency of such masters, is far more dependent than a person
of greatly inferior intelligence, but of correcter habits.
He who is the slave of his appetites, is under the dominion
of him who has the means of gratifying them; under the
pressure of urgent wants, and to procure an immediate
supply, he will comply with almost any conditions pro-
posed, careless, unguarded, and not weighing the conse-
quences, so long as the immediate object be gained. Such
persons are extremely liable to imposition, and to commit
acts of imprudence, and are little prepared to defend them-
selves against artifice, their temporary necessities operating
as a sort of duress.

Gautier, at the time of the execution of the will and
the deed, which I regard as simultaneous acts, was on the
eve of departure for Mexico, and dependent upon Mr.
Vreeland for the means of going. The money paid him
was his own, and yet it was not paid till the will and deed

were executed, the very day before he sailed. Mrs. Lewis's personal estate was inventoried at $53,000. After deducting from this the value of the leasehold estate in Beaver Street, and specific and general legacies provided in her will, there was a large amount of personalty remaining. Up to the 11th January, 1847, out of the rents and personal estate received by Vreeland, he had not paid Gautier over $1700; the remainder was either in his hands, or if disbursed, unaccounted for. The whole of this estate is swept away, without providing for the possibility of marriage and children, and without power of revocation, reserving a life-estate only to the decedent. The will and the deed were one act. It is impossible not to regard them as component parts of the same transaction. They gave the estate after Gautier's death, and secured it against intermediate acts. They were not only one act, but in their harmony, and in their purposes and provision, they were substantially a testamentary act, the will devising and bequeathing, and the deed preventing effectual revocation; both together disposing of the estate after his decease, and the deed putting him in a state of *quasi* tutelage during life. All the presumptions of law are against such a transaction. Vreeland owed Gautier every protection, and to profit by this act, he must dispel the cloud which hangs over it, give the fullest explanation, and show entire exemption from the influence to be implied, as well from his fiduciary relation as from the circumstances attending the execution of the instrument. Through the medium of the executorship, and by retaining the management and effectual disposition and administration of Gautier's property, Vreeland occupied a position of great influence. Gautier received not a dollar except through him. Instead of being in possession of his estate, he was often in want of the smallest sums, and compelled to borrow. His habits may have rendered this kind of guardianship very proper, but a relation which existed for his benefit, by placing him under a species of control and re-

straint, must be carefully watched, to see that it be not perverted for the benefit of another. I am aware of the weight ordinarily attached to declarations of intention in favor of the objects of testamentary bounty, and to the emanation of instructions from the decedent, and have not overlooked the evidence in that particular, which was adduced; but the effect of those circumstances is greatly influenced, if not neutralized, by the subservient position the decedent then occupied, the state of dependence upon Vreeland in which he was, and his present necessity of recurring to him for money to supply his wants. Were it not for one fact, this money influence might be only a matter of reasonable presumption; but the payment of the amount, or a part of it, needed by Gautier, immediately after the execution of the deed and will, is so indissolubly connected with the whole affair, and so stamps its character, as to corroborate and confirm all the natural and legal presumptions arising from the circumstances and mutual relations of the parties. I cannot but look upon it as the price of the deed; and the deed and the will were one. It would be absurd to suppose that the provisions of the will could vary from the deed; if there was to be a will at all, from the very nature of the case it must be in unity with a deed which purported to dispose of the estate after death. The same influence which produced the deed, or which brought the mind of Gautier to assent to its provisions, must have shaped the will in the same mind. I do not refer to any interference on the part of the counsel who received the instructions and drew the instruments, for none is shown, but to the motives and causes which operated on the mind of the decedent in giving those instructions, and consummating the act. I am of opinion, that the will ought not to stand, not only because in view of the relations of the parties the proof is insufficient, *deficit probatio,* but because the facts in proof go rather to corroborate the legal presumption, created under the circumstances, of undue influence.