DARLEY *vs.* DARLEY.

*In the matter of proving the last Will and Testament of*
JOHN F. DARLEY, *deceased.*

A codicil rejected, notwithstanding proof of instructions, when it appeared that
the testator was in a weak condition of mind and body, and had varied testa-
mentary dispositions in behalf of his wife, expressed in a will made shortly
before, in favor of a party with whom he was living, who had great influence
over him, and had expressed an intention to obtain his property.

P. G. CLARK, *for Contestant.*

J. W. WHITE, *for Executors.*

The will in this case was executed on January 27, 1855.
The codicil was executed on February 27, 1855.

*By his Will*, the decedent gave to his wife a life estate, or
during widowhood, in the income and profits of one-third
part of his property, in lieu of dower, &c.

*By the Codicil*, he revoked that bequest, and gave what
he had intended for his wife to his mother, during her life,
and after her death to go to his father for life; upon the
father's death the whole to go to decedent's children.

Also, *by the Will, the Guardianship* of his children is
given by the Testator to his father and Francis Mann, who
are named executors in the will.

The widow contests the will.

The grounds of her opposition have not been stated by her
counsel.

But from the character of the testimony introduced, it
would appear that the objection that will be presented is the
allegation that *the testator was improperly influenced* in
making the disposition of his property contained in his
*codicil.*

*The formal execution* of both will and codicil is sufficiently proved. *As to the will,* there can be no doubt.

In the execution of that instrument, it is proved by both the subscribing witnesses, that all the requirements of the statute were fully and literally complied with.

*And as to the codicil,* the only question that can be raised, is, whether a proper request to sign was made by the testator to the subscribing witnesses.

But the proof is sufficient on that point. Both the subscribing witnesses testify—

1st. That they were invited by testator's father to the testator's room, in order to become subscribing witnesses to the codicil.

2d. That the testator, in their presence, unfolded the will and codicil, and dated and signed the codicil, and thereupon in their presence declared it, very emphatically, to be a codicil to his last will and testament; and turned the paper round on the table towards the witnesses for their subscription; that he was then asked by one of them where he, the witness, should sign ; that the testator pointed in reply with his finger to the place of attestation, and told the witnesses to add the county of their residence to their names, saying that it was necessary in such cases.

*Ellen Cullen,* who was present at the execution of the codicil, and who was examined as a witness for the executors, testifies, that when the subscribing witnesses were coming into the house, she told the decedent that the gentlemen who were to sign the codicil to his will were coming in, and that the decedent thereupon directed her to tell them to come up to his room, but not to stay long:

That they came accordingly, and the codicil was executed and attested, as stated by the subscribing witnesses; also the attestation clause, which was at the foot of the codicil, and which was signed by the witnesses, and which it is manifest must have been read by the testator, who was so precise and particular in everything relating to this subject, recited the testator's request to the witnesses to sign.

That the witnesses signed at the desire or request of the testator cannot be doubted ; and that is all that is necessary. As to the allegation of *undue* or *improper influence*—

I. Nothing can be more strongly proved than the fact in this case, that the codicil, whether it be just or unjust, equal, or unequal, was nevertheless the *will of the decedent.*

It was done deliberately. Several days or a week before its execution he communicated in writing with his counsel respecting it, and finally gave his counsel, who drew the codicil, precise and detailed instructions on the subject by letter, written with his own hand, and which instructions were complied with.

The codicil, after it was drawn, remained in the testator's possession for some days—during which it underwent no alteration, although it is manifest that it was a subject of considerable solicitude with him—and he must in the meanwhile have carefully read and examined it.

II. *There is no proof that any influence or persuasion was exerted by any one* with the decedent, *respecting the testamentary dispositions to be made of his property.*

1. The only testimony that indicates that any one but the testator himself *ever spoke on the subject*, is the testimony of Mrs. Pignolet, and that testimony is not consistent with the known facts in the case.

Mrs. Pignolet testified in substance, that Mrs. Darley, the elder, the mother of the testator, said, that her husband, the testator's father, was to settle a house upon her (Mrs. Darley), and that her husband was to have the testator's property.

This statement is discredited, by the fact (among other things), that no such dispositions were ever made.

The children of the testator receive his property under his will, and his father's contingent life-interest in an annuity of four hundred dollars, given to his mother for her life, by the codicil, does not corroborate Mrs. Pignolet's singular story ; and yet it is upon this merest gossip that the allega-

tion must be hazarded—if made at all—that fraud or impro-
per influence was used to direct the testator's testamentary
dispositions; for the other testimony in the case does not,
any of it, point to the exercise of persuasion or influence with
respect to his property. It all refers—what there is of it—
to the use of harsh language by the testator's mother towards
his wife, and that not, except on one or two occasions, in the
testator's presence.

There certainly never were slenderer grounds upon
which to attempt to overthrow a will, deliberately made, as
this was.

And in this connection it should be noted, that several wit-
nesses, in habits of daily intercourse with Mrs. Darley and
the family, and much more intimate with them than Mrs.
Pignolet was, all unite in testifying that they never saw or
heard anything said or done to influence the testator in dis-
posing of his property.

2. *Influence* in these cases, to be *undue* or *improper*, must
be produced by force or fraud.

Simple persuasion or advice to a testator, to devise or
bequeath his property to one person or to another, or even to
the person persuading or advising him, is not sufficient cause
for annulling a will made in pursuance of the advice, no
matter how unkind or contrary to natural duty or affection
the will may appear to be. The persuasion or advice, to be
in such a case legally improper and capable of affecting the
validity of the instrument executed under its influence, must
be so overbearing or importunate in its character as to give
grounds for believing that it broke down or overcame and
destroyed the free will of the testator.

*Influence is also undue and vitiates*, when it is acquired or
is exercised fraudulently and deceitfully, as by fraudulently
keeping a testator in ignorance of facts, which, if known to
him, would have caused him to will differently; or by frau-
dulently causing him to believe in the reality of that which
has no existence, with the intent of inducing him thereby to
make dispositions of his property not before intended by him,

and contrary to his moral obligations or to natural justice or duty.

The influence, to be illegal and vitiate, must be of some one or other of these descriptions; and the facts in the present case do not bring it within any of them.

*No advice or persuasion* to the testator, to devise or bequeath in any particular manner, is proved.

*No concealment* of facts from the testator is shown.

*No fact was represented to him,* as existing, that did not exist.

*What was said by his mother,* of his wife's conduct, was merely *opinion* expressed of facts that were known to the testator personally as well as they were known to his mother, and this opinion was expressed *without any reference direct or indirect to his testamentary dispositions,* and was, in fact, but an ebullition—injudicious it may be, but still not unnatural—springing from excessive maternal affection, deeply moved by the painful sight of a son's deplorable and hopeless suffering.

It appears to me that never before was such slight ground as the testimony in this case furnishes deemed sufficient by a court to invalidate a will.

III. The motive or feeling which prompted the bequest to the mother in this case, was not without some rational foundation, and is not to be regarded as if it were a bequest to a stranger. The decedent was weak, deplorably ill, and—whether the wife was chargeable or not with neglect—all the testimony shows, that with his mother he found superior care, treatment, and nursing. It won upon his affections, and he rewarded it.

Upon reviewing all the testimony, the case seems to be, not one of undue influence exerted on a testator's mind, respecting his testamentary dispositions, but simply one of those unfortunate but too common cases in which domestic disagreements, having no reference whatever to testamentary dispositions, produced unkindness and ill-feeling; under the

influence of which, and without any prompting or persuasion from any quarter, a codicil unfavorable to the wife was executed. The facts appear to be simply these:—The testator was sorely afflicted—he found himself much more comfortable with his mother than at his own house—better nursed and more kindly and assiduously cared for—and he desired to stay there. He was very sick and very weak—his wife did not cling to him—she opposed his staying at his mother's—she even reproached and taunted him in what was very far from being a loving manner—he was, no doubt, petulant and captious, although not at all times wholly without provocation—and his mother, with some unnecessary vehemence, perhaps, took part with him in the disagreement.

Bitterness of feeling was by these means engendered between the testator and his wife; and in this unfortunate condition of things he made his will. He knew that his wife was pecuniarily independent of him, and he gave what he had to give where his affection at the time led him to bestow it.

This may not have been done wisely, or kindly, or even justly, but I must say that I think it was done legally and validly.

THE SURROGATE.—The will propounded for proof is dated and was executed the twenty-seventh day of January, 1855, and the codicil thereto on the twenty-seventh day of February. By the will, after some trifling bequests, the testator gave his property in trust to his executors, to pay one-third of the income to his "beloved wife, Phœbe Ann Darley," so long as she remained unmarried, and to apply the remaining two-thirds for the benefit of his two children, with survivorship, in case of death without issue and unmarried; and if they both died unmarried and without issue, their shares were given over to William and John Fyfe. Francis Mann and John Darley, the testator's father, were nominated exec-

utors, and also guardians of the persons and estates of the children.

By the codicil, the decedent revoked the provision in favor of his wife contained in the will, and in lieu thereof directed the payment of one-third of the income to his mother during life, and on her decease to his father for life.

The probate of both these instruments is contested by the decedent's widow, on the allegation that they were unduly procured. The testator was married in August, 1849, was twenty-seven years of age at the time of his death, and left surviving him his wife and two young children—one about nine months and the other nearly five years old. He resided and kept house in Macdougal-street, New York, and his parents lived in Brooklyn. He was in partnership with Mr. Boyce, his father-in-law, and had made his money in that business. For some two years he had been afflicted with consumption and scrofulous abscess, but he was able to go out until a short time before his death. On the 21st of December, 1854, he called at his parents' house in Brooklyn, and was induced by them to remain one night, as appears from a note to his wife, stating, "You need not expect me home to-night—my parents have persuaded me to stay with them over night." There is a draft of a letter, found among his papers, addressed to his wife, but which does not appear to have been sent to her, in which he says, "When I left my home, I had no idea of remaining here; it was my intention of merely explaining to my parents my unhappiness, of which, up to this time, they had no knowledge. My troubles up to this time I had kept from them, for they were opposed to my early marriage, and as I had made my bed so should I lay; but your coldness, unfeeling coldness, to a sick dependent husband, I could bear no longer." . . "My parents persuaded me to remain over night, my every want has been attended to—and, oh! with what cheerfulness!" . . "I shall spend the holidays with my parents—they may be the last I shall spend upon this earth, and they are best entitled to my society—if they wish it." Mr. Martin states, that he saw the decedent at his

store, 106 William-street, about a week after he went to Brooklyn, and he said "he was to return on the Wednesday following." He likewise learned from the decedent's father, that "there was some little difficulty in the family; his wife persuaded him to remain, as he came there in the afternoon, and it was cold." The decedent also stated to Dr. Green, "that he came over without intention of staying, but finding his mother out, his father urged him to stay till she came in; that when she came in, he concluded to stay." Three days before his death, the decedent dictated and signed a paper, in which occur the following passages :—"I solemnly asseverate that my father or mother had nothing whatever to do with my coming to Brooklyn; and although repeatedly urged by them to come on a visit, in which my family were included, even to my servant, I so consulted my wife's wishes, as to decline every invitation, and in fact almost deserted my old parents to gratify her; and when I came to Brooklyn, it was without the least idea of remaining; but weakness, combined with the lateness of the hour, and inclemency of the weather peculiar to the season of the year, induced me to remain. My wife and mother know the rest." Mr. Morgan also testifies, that some time in the second week of January, the decedent stated to him that "he had no intention of staying at Brooklyn when he came; that his mother induced or urged him to stay; that he had sent for some things, and they had not been sent, and in consequence this difficulty had occurred which had kept him there up to that time."

It thus appears, that whatever were the sources of the decedent's discontent, he had not deliberately determined to desert his family, but at first was persuaded to remain over night with his parents, and even then did not intend to prolong his visit beyond the holidays. It resulted, however, otherwise. On the 22d of December he sent his father with a note to his wife, requesting some articles, and saying, "Send George over by father; wrap him up warm; I shall spend the holidays here. I am writing you a letter; father

cannot wait for it; shall be pleased to see you, mother, and George over here, if you have time." The articles requested not having been sent, the decedent's mother called the next day at the house in Macdougal-street, and obtained them. At that time some dispute arose, and as Mrs. Boyce testifies, Mrs. Darley the elder " forbid any member of our family ever darkening her doors. She said his wife had been entirely a useless wife to him . . . She hoped we would never see him alive." Ellen Cullen, the servant who accompanied the decedent's mother on this occasion, states, that what Mrs. Darley said was this: " She stretched out her hand, saying good-bye ; it is not likely we shall meet again, for I shall never darken your doors." The decedent kept a pocket diary, in which he made entries, commencing with the 21st of December and continuing, with some exceptions, until he became too ill to write. It is evident from some of the first entries, that he was in the first instance " persuaded" to remain at Brooklyn, and that his parents, on their return from New York, reported to him unkind treatment on the part of his wife and her family.

Notwithstanding his illness, Mr. Darley was not confined to the house, but went out frequently, and visited New York at least ten times in the month of January and five in February. This fact is important, in judging to what extent his intercourse with his wife depended upon his or upon her volition. Mrs. Boyce testified, that he called at the house in New York about two weeks after he had left, took dinner, and though a little " dissatisfied" and " irritable," said he would be over in a few days to stay. He called again the next week, and " wanted some arrangements made about his room—some things moved—it was all done. He said he would be back on the Monday after. After that, he said he would not come permanently till Wednesday—he had a previous engagement. I think he came after that to say he was not coming at all." This testimony as to his intention to return is fully corroborated. On the 1st of January he enters in his diary, " Mr. Smith called ; from him was glad

to hear children were well—it is too bad to be separated from them." On the 4th of January, he writes, "Phebe has called ; she has done her duty ; I forgive what she has said ; if my relations, Sarah in particular, would only let us alone, I should be happy." The next day he was visited by Mrs. Pignolet, in Brooklyn. She met him as he was going out with his father, and said to him, "how comfortable you all appear here ;" and he replied, "but Mrs. Pignolet, I have a home and a family and children, and I must go there." Thus a reconciliation having taken place, and the period originally contemplated for his visit expired, there was a manifest disposition te return to his residence. On the 5th, he says in his diary, "anticipate seeing the children with great pleasure ;" and on the 6th, "my wife came over to see me—was delighted to see her." Still he did not return, though able to call at the house on the 8th and 10th. On the 12th, he received a note from his wife, which he says "was such a one as a wife should write ;" and the next day he answered it, appointing his return on the ensuing Wednesday, the 17th. But the promise was not fulfilled ; and so the matter went on until it is obvious he fully made up his mind to remain in Brooklyn—complaining of his wife, for being "cold" and "determined to have her own way ;" and refusing to leave, because he was "doing well there," and "self-preservation is the first law of nature." Still no open rupture took place, though his absence from home must have been a constant source of annoyance to his wife and her family, and its tendency was inevitably to promote mutual dissatisfaction. While affairs stood in this condition, he made his will on the 27th of January, in which he left his wife the income of one-third of his estate ; and then, precisely one month after, he revokes this gift, and makes his mother the beneficiary of his bounty. It certainly creates great suspicion, to find such an important variation so suddenly made ; and it should be accounted for, especially when made in favor of the party with whom he was living. Again, it is worthy of note, that the testator's health had been gradually declining ; from the

22d of February he had been very ill, and on the 26th, when "all thought" he "was going to die," he received the last rites of the church. The entry he made in his diary on the 27th was, "miserable all night and day—horrid weak—could not stand." It was during this period the codicil was projected and consummated, when his great prostration and the urgency of his symptoms were supposed to indicate speedy dissolution. This circumstance adds another reason for great caution and circumspection in weighing the circumstances attending the performance of the act.

In judging of the validity of this instrument, the first duty is to ascertain the state of the decedent's mind, and whether it was so debilitated as to render him susceptible of being unreasonably influenced by others. Mr. Root, one of the subscribing witnesses to the will made the month before, states, that after the will was executed the decedent remained in his store some time, waiting for his father. He says, "I observed a very great change in him from what I had known previously—it was mentally and bodily—the feebleness of his body seemed to be communicated to his mind. He was peevish and fretful, and what I should call childish in his manner. It was evinced both in matter and manner. I was first struck by the remark that he made in a whining, peevish manner, "why don't my father come in? he has no business to leave me here so long. . . That remark was repeated once or twice .. interrupting the general conversation. Another remark he made was, 'your father-in-law is very different from my father-in-law.' I led him away from that subject, and don't know what he referred to." The witness also stated, that Mr. Darley said he was going to Brooklyn, observing, "you know mother can best take care of me." Mrs. Boyce mentions several circumstances, indicating much deference to his mother's directions. His wife requested money to buy the child a hat, and he asked his mother how much he should give. His mother brought him food, and he would say, 'I don't want it, but if you say, mother, I must eat it, I will do it.' If she was going out of the room, she would

say sometimes ' don't talk,' and he would reply ' if you say I must not talk, I won't speak till you come back.' " When his wife and her mother on one occasion desired to sit up all night with him, and he wished them to remain, he was compelled to yield to his mother's objections, saying, " you see how stubborn she is." His mother said, " John, if it is your wish, I will leave the room, but the house is my own, I will go where I please ;" she said " if we did stay she would not be responsible for anything that happened." The second night before he died he took the ring off his wife's finger, and when she asked for it back—" it was all she had of his" —he replied, "just as mother says." Dr. Green, the decedent's professional attendant, testified, that from the previous summer he had gradually been " getting more feeble in body and mind." He saw him several times in December, before he went to Brooklyn, and says, " he was extremely peevish, easily irritated, easily excited." " He was apt to put a wrong construction on things I thought had no bearing on himself. Any observation made in his presence he considered as intended for himself. I made great exertions to convince him it was not so. That is usually the case. . . Some most amiable persons with that disease, become peevish and unsatisfied in their own families. . . It is characteristic of that disease to be perfectly under the influence of present circumstances, and it was eminently so in his case." The Doctor says there was no mental " aberration," but there was " imbecility," and such debility, " that he was in such a condition as to be *bought* by anything."

On the other hand, there is the evidence of Drs. Cullen and Glentworth, to the effect that his mind was in good condition. Dr. Cullen expresses the opinion that his mental faculties " had not become affected by his disease." He observed no wandering, incoherence, delirium, nor any slip of the memory—he " conversed with great clearness." " He died of scrofula," he says, " and usually one of its characteristics is to leave the mind very clear, up to the last moment perhaps." Dr. Glentworth states that " his mind was very good, remark-

ably so for a sick man.  I noticed no incoherence or aberration.  I thought his mind was more active and vigorous than otherwise.  I could perceive no loss of memory." . . "The mind does not usually suffer with the body, in the disease he was suffering under.  It is generally more buoyant—there is more vigor."  Mrs. Steele says, " His mind was very clear, I should think.  I saw no indications to the contrary."  Mr. McGinnis, one of the witnesses to the codicil, thought " he was perfectly sane; seemed to know perfectly well what he was doing; seemed natural; was calm and collected."  Mr. Devoe, the other witness to the codicil, expressed substantially the same opinion.  Mr. White, who drew and witnessed the execution of the will, thought " the decedent's mind perfectly sound," and says, " I never saw any one manifest more clearness and more solicitude about his will."  While, from these proofs, there does not appear to have been anything like mental aberration, they indicate, in connection with his complaints about his wife, the entries in his diary, and various other circumstances, a degree of nervous irritability and a loss of tone and independence of will which might easily be abused.

That the decedent complained of his treatment by his wife is abundantly shown by all the proofs, after he left his home in December; but so far as I can discover, his dissatisfaction related chiefly if not entirely to her want of attention, and coolness—that he was not allowed a fire in his room, and the house was too crowded.  The reasonable answer to these charges was, that he had been living in the same house, with his brother-in-law, nearly five years; that his mother-in-law, with whom he had spent two summers, at Fishkill, without paying any board, was spending the winter with him, at his own solicitation ; that he was not allowed fire in his sleeping room by the express directions of his physician; and that, in the language of the Doctor, "he was very well attended to and cared for, and very pleasantly situated at home."  His wife was delicate, and had the charge of a young babe, but his mother-in-law assisted in attending him ; and she testifies

that she herself dressed the abscess in his back " twice a day nearly for a year." As to the state of feeling between him and his wife, a number of witnesses show, so far as such a point can be established, that it was harmonious, tender, and affectionate, I mean externally. Mrs. Boyce says, " He never had any difficulty with the other members of his family, that I know. He never had any serious difficulty with his wife. Their intercourse was apparently as affectionate as in other cases of man and wife. The greatest fault he had with her was that she was too economical." Mr. Morgan, who was about the same age as the decedent, and was on intimate terms with him, states, that towards the 1st of December Mr. Darley, in a conversation at his house in Macdougal-street, said, " that he had a great deal to be thankful for; he had a comfortable home; that his wife was very attentive, did everything for him that he wished, and she had no time to do anything else but wait on him. She did everything for him, and what she could not do, her sister did." " Previous to this, I had often heard him speak of his wife in terms of the highest commendation. I never heard him speak otherwise of her, until after he went to Brooklyn." The witness mentions several circumstances tending to corroborate his opinion of the affectionate character of their relations. Mr. Martin was intimate with Mr. Darley, and heard him, during his sickness, say how well he had been treated. Mr. Shook testified that the decedent frequently spoke to him before he went to Brooklyn " in the highest terms of his family, and of his wife in particular," and he " never heard him speak otherwise than in commendation of her." Mrs. Clearwater, who was well acquainted with the decedent and his wife, and visited at their house, characterizes their intercourse as harmonious, and says, " he always spoke of her with perfect kindness; I repeatedly heard him say that the family treated him too well; they had done too much for him; he never could repay them for it—they were always ready to wait upon him." Mr. Clearwater testifies that he heard the decedent say " his wife was not in very good health, and the

family, together with her and Mrs. Boyce, had done too much for him; they were always ready to run for him at any time. The intercourse between him and his wife was perfect harmony; he always spoke of her in the highest terms to me." The Rev. Mr. Shaw visited in the family, but never heard any complaint from the decedent until he visited him in Brooklyn. Catharine Dreger, who had charge of Mr. Darley's youngest child, says, " he never complained about not having fire; almost all of them waited upon him; he never complained that he was not well waited upon," and she " never heard of any trouble between him and his wife, while he was there. . . The abscess in his back was dressed twice a day," by his wife and his mother-in-law, Mrs. Boyce. Dr. Green thought " he was very well attended to and cared for, and very pleasantly situated." He " never knew of his being neglected;" nor heard any complaint of his wife " previous to his going to Brooklyn, and they were not very definite then," but " all fancy," in his opinion.

This evidence appears satisfactory, both in regard to his treatment at home and the absence of any open complaints; and yet, from the first day he spent under his parents' roof, he expressed in the freest manner his dissatisfaction, even to such a degree as to attribute to the neglect of his family the wretched physical condition to which he was reduced. The letter he wrote his wife on the 22d of December is filled with allusions to her unkindness. Was this a delusion, or was it founded on fact? It is certainly difficult to form an intelligent opinion upon such a point, when we consider the privacy which ordinarily attends the domestic intercourse of husband and wife. But still I am inclined to conclude that up to a short period before leaving home, no cause for disagreement existed; and that whatever difficulty subsequently arose was in consequence of his irritable, nervous condition, dwelt and pondered upon until its extent and importance became greatly exaggerated. The difference between his wife and parents added fuel to the excitement, his tarrying away from home naturally increased the coolness, and though there

was for a time a mutual condonation, the quarrel might readily be revived by the slightest circumstance.

I will now proceed to inquire into the history of the preparation and execution of these testamentary papers, and see to what extent they emanated from the decedent, and how far the party interested to sustain them was privy to the transaction, or interfered in their procuration—and in this connection, it is worthy of notice that the provision for the wife, in the instructions given for drawing the will, had been altered by some person before they reached the draftsman.

The will was drawn by Mr. White upon the written instructions of the decedent, enclosed in a sealed envelope, and handed to the counsel by his father, a week or ten days before the 27th of January. The instructions were returned for further explanation in consequence of a line having been drawn through the words, " one third," in the portion of the letter directing what share of the income should be given to his wife. When the instructions were returned, " one third" was written over the erasure in the decedent's handwriting. Mr. Darley's father brought back the instructions, made some verbal explanations, and said, "he wanted it done as soon as possible, and that he had not interfered with John about it; he had taken his own way." The decedent's father accompanied him to New York when he came to execute the will, though he was not present at the ceremony. In respect to the codicil, Mr. White states that he received from the testator a letter requesting information how far his power of testamentary disposition extended over his property, and having given the proper reply, received another letter, dated February 23, directing him to draw a codicil, giving that portion his wife would have had, to his mother for life, and on her decease, to his father for life. Mr. White had some two or three interviews with the father in respect to the codicil; but nothing appears to have passed showing any interference, except so far as may be inferred from the circumstances detailed. It is thus shown that the testamentary papers in controversy were drafted upon the decedent's written instruc-

tions, and that the father was the medium of communication between the decedent and the counsel. It is proper also to add that the decedent was very particular in his directions that the "will should be drawn very carefully, so that it could not be broken, for there might be law-suits about it." The will was executed at the store of Mr. Root, No. 7 Nassau-street, New York; the father was not present, though aware of the transaction. The codicil was executed at the father's house in Brooklyn; the witnesses were called in by the father; Mrs. Darley, the mother, told Ellen Cullen he had gone for them, and both father and mother were present at the ceremony. They were fully conversant, therefore, with the facts. How far any disposition existed on the part of his parents to affect his testamentary acts, must next be examined.

Mrs. Pignolet testified that she visited the decedent three times during his illness, at his father's house in Brooklyn. By the decedent's diary, it appears that two of these visits were on the 5th and 30th of January. She says, "each visit Mrs. Darley spoke of John, most of her time and conversation. She said she hoped he would not return to New York, she would rather he would remain with her. She spoke very unfavorably of his wife, and found fault with her treatment of him, and also found fault with her mother and sisters. She said his wife came to see John, but she did not wish her to come; one reason was, he was worse after she left, they talked so much; and she conveyed to me the impression, that John was more disposed to be satisfied with his wife after she left. That there was too large a family at John's house, was one cause of complaint. She said she didn't like to go there. She said his wife was a woman without feeling altogether; she had no feeling at all. She said he was not going to leave her anything; one reason was, her father was well enough off. At one conversation, he was going to dispose of his property, so that his wife should have none of it, and they themselves were to have it—his father said she, Mr. Darley, her husband, was to settle a house upon

her, and she was willing he was to have what was to come from John. She gave me to understand she was going to get the children as much as she could from the control of her family—as much as they could—she always used Mr. Darley in the arrangement. I understood Mrs. Darley that they would endeavor to retain his property, and get the control of the children. There was a general dissatisfaction with the Boyce family. She said she was desirous of keeping him there, and from the influence of the Boyce family. She didn't want him ever to go back there again; she said, 'John will gradually find out how much better it will be for him here than there, by the better treatment he receives.'" That the particular plan of disposition in relation to the property, expressed by Mrs. Darley, was not precisely carried out in the will, does not discredit Mrs. Pignolet's testimony, but only shows that the exact scheme was not perfected in the way proposed. The importance of this evidence consists in its exhibition of a general intent in respect to the son's property, adverse to the interests of the wife.

This disposition on the part of the mother existing, it was actively manifested throughout the whole course of his illness. Ellen Cullen, the domestic, who attended him, deposes that at the first, his mother used to leave the room when his wife called to see him, but that latterly "she remained," or else the servant "stayed," so that his wife "had no opportunity of being alone with him, or speaking to him in private." Ellen says this began about three weeks before his death, which would bring it about to the time the codicil was being prepared; and she says the reason was, they always found him so much worse after his wife's visit, it took a day to bring him around right. She also states that five weeks before he died, Darley told his mother never to leave the room when his wife came; she "used to tell such stories that it made him ill." Mrs. Pignolet's version of the motive, as just observed, was altogether different; within five weeks prior to his death, however, his own diary shows a visit from his wife, when she was as "kind as she knew how." This

was precisely two weeks before the codicil was executed, and there does not appear to have been any other visit made by the wife until some twelve days after, so there can be no doubt Ellen was mistaken as to the period of time when these instructions were given. The decedent being thus situated in the house of his parents, and receiving his wife only in the presence of third persons, it may be well to see still further how much he was encouraged in continuing upon terms of harmony with her. Dr. Green says, "I heard his mother speak to him about his wife, when I visited him in Brooklyn. They were the most awful tirades I ever heard. She was exceedingly abusive. She told me he would have died if she had not kept him there and taken care of him." "It was at one of my first visits. Two or three times she was pretty much the same." Mrs. Pignolet testifies to declarations of a similar character, and also that the mother stated, "after his wife's visits she had to undo what she had done— that the visits of the wife had undone what she had done in getting him reconciled, his mind composed—resigned, as it were, to everything, as 'I want to have him;' so much so, she thought she would keep his wife from going in, in future, if she could; after his wife was gone she always had more trouble; he was more restless and dissatisfied. She did not wish them to have any communication together." Mr. Martin testifies to violent complaints made by the decedent's mother, in the presence of the decedent, on the 11th of March, as to his wife's treatment and conduct; and a repetition of the same statements in the hall where she detained him three-quarters of an hour. He was there on the 15th of March, two days before the decedent died, when Mrs. Darley called with the children, and a painful scene was enacted, which I do not desire to detail. Mr. Shook saw the decedent at Brooklyn about the middle of February; his mother was present, and "there was a good deal said by her in reference to John's wife and family. She complained that they were the cause of killing her son, or to that effect." He went there with Mr. Smith; the mother came in, and

commenced talking.    John asked her to leave the room, saying it was his, and she replied it was, " till he died."    " He wished her to leave the room; she did not, but took a seat." The Rev. Mr. Shaw, the clergyman who married the decedent, testified that he visited him at Brooklyn, somewhere between January 20 and February 1, and found him very much excited on the subject of his domestic affairs; his mother was not present, but he had a conversation with her in the hall, in the course of which she spoke in severe terms of her daughter-in-law.    There can be no doubt, then, of this hostile feeling, and of its constant manifestation.    It broke out first on the 22d of December, when the mother called at Macdougal-street, but it had existed before.    The decedent himself acknowledged that his parents had been opposed to his " early marriage," and Mrs. Boyce testified that there was a period when " the mother, Mr. Darley, and his wife, did not visit for a short time," and that in conversation about taking his family to his father's house, the decedent said " he never would take them there; his mother and his wife never could agree."    He said, repeatedly, " he never had any wish to go to Brooklyn—he would always remain with us—with our family."    Mrs. Clearwater states that after his return from the country, in the fall of 1854, she heard him say, " it never would do for his wife to go and live in Brooklyn with his mother; he said his wife was always a quiet, docile woman, who never interfered with any body's business.  I have heard him say, a number of times, his mother was an uneasy, restless woman.    I believe the conversation was brought out by an invitation from his mother, and that Darley said his wife should not go."

Such are the circumstances attending this unhappy case, and they present a question by no means free from embarrassment.    Here was a young married man, living upon terms of apparent amity with his wife, uniformly treating her with kindness, and commending her good qualities to his confidential companions—affected to tears, at the idea of parting with her, a few months before, when going into the country—refu-

sing his parents' invitation to their house, on the ground of a probable want of harmony between them and his wife—and, up to the 21st December, when he left his home, never giving utterance to the slightest complaint of ill-treatment or want of affection. He visits his father's house, he says, for the purpose of " explaining his unhappiness," and without any intention of remaining. He is in the first place persuaded by his mother to remain there over night. By the next morning he has determined to continue during the holidays—a conclusion not likely to be changed after hearing, from one side only, an account of the difficulty between his mother and his wife. On the fourth of January his wife called to see him, a reconciliation took place, and from that time the decedent evidently intended to return to his own home. Changes were made in his apartments, and the day even fixed for his return, and yet he still held on, when he was without any apparent cause for fresh dissatisfaction. On the 27th of January he made his will, giving his wife the income of one-third of his estate; so that it is evident, up to that point no influence had disturbed materially his testamentary intentions in her favor. It is true, when the instructions reached the counsel a line had been drawn through the direction to give " one-third" to his wife ; but if that erasure was made by him, it is strange that he should have returned the instructions with the same words written again in his own hand. I take that fact, in connection with the terms of the will, and the bequest in favor of his wife, after he had been over a month under his father's roof, as proof that whatever had been the original grounds of his complaints, they had either been removed, or were not of so grave a character as to effect any great change in his testamentary dispositions. The heads of a will, in his writing, produced in evidence, show that previous to leaving home, his views in respect to her portion had been more liberal, and also that he had not proposed to place the children under the guardianship of his father. But still, the will made in Brooklyn was not a very wide departure from his previous plan. What then

occasioned the codicil? Its sole purpose was to take the wife's portion and give it to his parents. This change of intention was made subsequent to the 27th of January, and the only explanation I can find why it took place consists in the letter written by the decedent to Mr. White, on the 23d of February. He says in this letter, " I am glad to learn I have control over so large a part of my property. My wife treats me with the utmost contempt—neither comes to see me nor sends my children. She alleges I would keep them. Now, I wish to add a codicil to my will, stating, that in consequence of her inhuman treatment towards her sick husband, he cuts her off entirely, saving only her thirds; or whatever is proper, in my real estate—say five lots on 109th-street, between 4th and 5th avenues, cost $1250, mortgaged for $700. As this is unproductive property, her interest will amount to nothing ; but her father will leave her $30,000 or $40,000. The portion she would have had I give to my dear mother, (who works like a slave for me, and sustains life in my shattered frame, day by day, by her untiring attention to my wants,) during her life-time—or if it would be more convenient for you, make it a round sum of $400—and, at her decease, to father during his life time, or to whichever party lives the longest—and then it goes back to the children. Her father gave her $1000, to purchase furniture with—of course I do not wish to touch or meddle with that—but my private furniture I willed to go to my boy, at 17 years of age. If you wish the will, father will bring it." The last entry in Mr. Darley's diary, previous to giving these instructions, of a visit made by his wife, occurs on the 13th of February, in which he says, " Phœbe came in, stayed till 2 o'clock, talked and was as kind as she knew how." On the 15th, he enters, " Received a letter and some things from Phœbe." On the 16th he went out. On the 17th he went to New York. On the 18th he rode out. On the 19th he went to New York. On the 20th and 21st he went out; and on the 22d, Mr. White wrote to him, explaining what power of control he had over his property. On the 25th, he enters, " Phœbe, mother, and

George called;" and on the 27th, the very day the codicil was executed, another visit from Phœbe and her mother is entered. It appears, from his letter to Mr. White, his wife had not visited him nor sent the children, and this I understand to be the alleged motive for altering his will. It is true, they called on the 25th, two days before he carried out his purpose, but he did not relent.

In judging whether this was his own spontaneous act, conceived and consummated free from any undue efforts to influence him, on the part of those by whom he was surrounded, we must regard not only his general debility, but also the peculiar symptoms that had been manifested in his case, in respect to the vigor of his mental powers. I am satisfied that his mind was in a state of morbid irritability, consequent upon his disease and suffering. He was disposed to imagine slights and neglects, and exaggerate trifles into undue magnitude and proportion. At the same time the condition of his body and nervous system made peculiarly grateful whatever ministered to his present physical comfort. When, therefore, during his visit at Brooklyn, which he only intended to be temporary, he found himself pleasantly situated, there was an inclination to yield to these inducements, though, as he stated, his " duty" called him to his wife and children. This was a course of conduct likely to excite remark among his acquaintance, and call for expostulation on the part of his wife. He would naturally vindicate himself, but his complaints were general, and, so far as I can discover, the most important of them related to a point upon which his wife was only following the directions of his medical attendant. The others referred to a want of personal attention, as to which the evidence shows he had little if any reason to complain. There is a great absence of specification in his charges, and the manner in which he talked to visitors evinces both an abandonment of reserve upon topics ordinarily sacred between husband and wife, and also a morbid state of excitement as to his domestic affairs. The Rev. Mr. Shaw states, that " he was very much excited," and complained that his

wife was " cold, and that she had not obeyed him. She had solemnly sworn to obey him and she had not done it." To Mr. Morgan he stated that " he would get into a passion and fly off at a tangent, and his wife was like the marble mantel-piece—would pay no more attention to him than a statue." At one time he says to Dr. Green, that when he scolded her, " he never could make her shed tears ;" and at another, when told by Mrs. Clearwater that she was almost always in tears, he replied, that " tears were cheap, they were not for him." His mother made no secret of her belief, that his wife's neglect had killed him, and her son learns to echo it. For example, he told Dr. Green he had " been neglected by his wife, and if it had not been for his mother he would have died ;" and on the eleventh of March, when looking at his daguerreotype, he burst into tears, and exclaimed, " See what a woman will fetch a man to." This language, from one who had long been afflicted with an incurable disease ; who, shortly before leaving his residence, had expressed deep gratitude for his wife's kindness and attentions, and shown every appearance of being upon terms of harmony and affection, is certainly strange—I had almost said unaccountable. There is nothing in the case giving the least color to such an imputation, except the excited statements of mother and son, without facts to support them. His own previous declarations refute the charge, the evidence as to his treatment refutes it ; and in view of the nature of his disease, the proof of the care which had been taken of him, and the absence of all previous complaints, it was certainly a violent imagination, to suppose that his life had fallen a sacrifice to his wife's inhumanity. These strange and excited views had no justification in fact. That they must have had a very material influence upon his testamentary acts there can be no doubt. They opened a ready door of access to fresh complaints, or evil suggestions, in relation to his wife's conduct—and when she failed to visit him, or bring the children for a week, though during that time he himself went twice over to New York, and might have called on them—and although at her last visit she had

been "as kind as she knew how,"—he writes to the lawyer, to have her "cut off" forthwith. He had left his home, but still his wife followed him with her attentions, and treated him with kindness. Her visits, which were seldom made except under jealous and watchful eyes, were omitted for a brief space, and this is made the occasion, for extinguishing her interest in his property, though the alleged contempt was purged two days before the date of the codicil, by a visit from his wife and son. During the course of his illness, it is manifest there were two struggling interests, the wife on one side, desirous to have her husband return home, and the mother on the other, determined to retain him under her own charge. At one time he yields to the former, and prepares to return, and then again his purpose fails without any ostensible reason springing from the conduct of his wife. Everything is ready for him, but he postpones the day, and finally abandons the intention entirely. Did he succumb to a stronger will—had he been free from influence, would he have remained where he was, and eventually have given his wife's portion to his mother? Now, in forming an opinion upon this question, it is impossible to overlook the signs which escaped him before third parties, manifesting a degree of dependence upon his parents which was not far removed from weakness. These have already been enumerated, and I will not further allude to them than to say that they exhibited an impaired and weak volition—just that helpless and impressible condition which presents no obstacles to the exertion of a strong power on the part of another. And that power was almost continually present with him; it was animated with a spirit of determined hostility against his wife, which broke out frequently and violently in the presence of comparative strangers; there it was, night and day, strengthening its influence by assiduous attentions, while the wife could only occasionally possess the opportunity for counteracting its sway, and then under great disadvantages. I would not for a moment be understood as suggesting a doubt as to the sincerity of those maternal ministrations, which soothed

his pangs; far be it from me to undervalue a mother's tender care and solicitude, her unwearied vigils and patient endurance; nor would I attribute these movements of natural affection to any other than the holiest motive. But still it is my duty, however painful it may be, to say, that the gratitude which flows from the heart, in response to such kindness, and the influence acquired by maternal attentions at the sick bed, should never be perverted. The power thus obtained should be exercised otherwise than in fomenting the elements of discord. And yet, a number of witnesses testify, that the mother was loud in her accusations against her daughter-in-law, and if I am to believe a disinterested and respectable witness, avowed her deliberate intention, that she would "endeavor to retain" her son's property, "and get the control of the children," and "keep his wife" from conversing with him. This latter purpose was accomplished in a great degree—for there was little intercourse between this unhappy couple, except under the surveillance of the mother or a domestic. Whether the former purpose was successfully accomplished depends upon the fate of this codicil. The project had not succeeded at the time the will was executed, but another month passed; the decedent was gradually declining; his wife was prevented from "undoing" what had been done in her absence, when she appeared there on the 25th and 27th of February; and was debarred from that private and confidential intercourse which might have led to a better understanding. He had failed so much, that the day before the codicil was executed it was thought he would expire, and he received the last ritual consolations of religion; and then, when it was thought his end was imminently near, he puts his hand to this paper, transferring the share given to his wife shortly before, over to his parents.

Shall this instrument stand? The instructions are clear and explicit, but the same power which produced the codicil could produce the instructions for it. How was the intent manifested in these instructions brought about? Were there elements at work to produce it, on the part of another and

interested power; and was there such weakness of will, and such a morbid state of the mind and temper on the part of the decedent, in regard to his domestic relations, as exposed him to undue influence. It seems to me that both of these inquiries must be answered affirmatively.

What is undue influence, and what degree of it requires to be exercised in order to have the act improperly procured, judicially avoided, depends more upon the peculiar circumstances of each individual case, than upon any abstract, theoretical reasoning. I am not at all inclined to yield to the view that it must amount to actual duress in order to be unlawful, nor does there seem to be any strict analogy between the two cases. Duress may be exercised when the will has a present, independent power, and the man is conscious of it, but is compelled to act against his will. The force taken away, the pressure removed, he immediately asserts his independence. This is compulsion and violence—moral or physical. There is a species of undue influence which resembles duress in its external action, and by its importunities compels an act against the real secret wish of the subject. But its most usual manner of approach and of action is more stealthy and subtle. It saps and undermines the will itself—obtaining, as it were, a foothold within, and shaping and moulding the desires, so that there no longer remains any wish to resist, or power to withstand its suggestions. This kind of influence is by far the most dangerous, from the fact that its movements are often quiet and noiseless, and its effects are hidden in the apparent volition of its subject. And yet this cannot be called duress. The stronger will frequently acquires an extraordinary power over the weaker, not by mere dint of importunity, by threat or force, but by that steady persistence, that unrelenting pursuit of its purpose which wear away less stubborn determinations, or again, by artfully taking advantage of the play of emotions and passions, appealing to prejudices, flattering weaknesses, and fomenting quarrels. A dominion thus acquired, if employed to effect a testamentary act, may be just as potent, distinct, and positive in its

results as if coercion had been used, and I cannot perceive why it should not be viewed in the same light, and receive the same treatment at the hands of the court, as palpable duress.

In the case now before me, there is evidence of weakness and vacillation of will, a childish dependence upon parents, exaggerated ideas of trifles, and peculiar sensitiveness as to personal comfort. There was a marked change in the domestic affections, without any sufficient apparent cause indicated in the intercourse between himself and his wife. The excitement which existed was not allayed even after reconciliation. It received abundant aliment during the absence of the wife, and a fair opportunity for checking it was not afforded. The decedent was persuaded to absent himself from his residence, and to continue within the sphere of a hostile influence, until he eventually came to the belief that his wife's conduct was the cause of his approaching death. Still he provides for her in his will, and not until reduced to the verge of the grave does he disinherit her, and then only on the allegation of a neglect, which, if it had occurred, was repaired before he signed the codicil. Declarations of an intent to effect such a result are proved to have been made by the person who had the greatest influence over him, who was around and about him continually, who was hostile to the interests of the wife, and who takes the benefits under this codicil of which the wife was deprived. In all this are displayed to my mind the subject, the cause, and the effect, and being convinced that justice requires that the act thus effectuated should be denied legal validity, I must not hesitate so to declare. There will therefore be sentence for the probate of the will, and for the rejection of the codicil.