NEW YORK COUNTY. — HON. D. C. CALVIN, SURROGATE.—
May, 1877.

## BOOTH v. KITCHEN.

*In the matter of the application to have a certain paper writing declared to be the second codicil to the last will and testament of* OTIS DYER, *deceased.*

The mere fact that a subsequent will or codicil which reverses some of the provisions of a prior will is in the handwriting of one advantaged by such subsequent will or codicil, does not overcome the presumption of an execution of the will free from undue influence which arises from the fact that the testator was a man of intelligence, understood the provisions of the subsequent codicil and their effect, and executed the will in due form of law.

What facts are sufficient to warrant a finding of undue influence.

THIS was an application for the probate of the second codicil to the last will and testament of Otis Dyer, deceased. The will was admitted to probate, together with the codicils, in December, 1874.

In November, 1875, the contestants, William H. Booth and others, infants, appearing by their father, Henry Booth, filed allegations against the probate, but on the day appointed they failed to appear, and the will and codicils were admitted.

In November, 1875, the contestants, by petition, prayed that the probate be vacated, and that they be allowed to interpose objections to the probate of the second codicil. The surrogate denied the petition, and the contestants appealed to the general term, which reversed the surrogate's decision, and the contestants were allowed to offer evidence in support of their objections to said codicil, and the case was sent back for the hearing of proofs *de novo,* so far as the contestants were concerned. The questions raised on the submission of the case were, *first,* that the codicil appear to be in the handwriting of William R. Kitchen, one of the executors, whose children received the sum of $8,000, which had been previously given to the contestants, and that Kitchen's relations with the testator were of a confidential character; *second,* that the testator, at the time of the execution of the codicil in question, was in such enfeebled condition of body and mind as to raise the presumption of undue influence, which has not been overcome by the testimony of the proponents, by showing that the testator knew its contents at the time of execution, and that it expressed his real intention.

BARLOW & OLNEY, *for proponents.*

A. B. JACKSON *and* A. P. WHITEHEAD, *for contestants.*

THE SURROGATE.—For the purpose of determining the questions raised in this matter, it will be necessary to refer only to the testimony bearing upon these points, but to a clear understanding of the case it will be necessary to consider somewhat carefully the terms of the will and codicils, in order, if practicable, to ascertain the extent and object of the change sought to be effected by the codicil contested.

The will bears date October 17, 1870, and among other dispositions he bequeaths unto Henry Booth, $7000; William R. Kitchen, $20,000; and to three daughters and one son of said Kitchen, $3000 each; to Mrs. Wardlaw, the use of $500 for life, and at her death, to her children; to Caroline Bell Wardlaw, her daughter, $4000; Mary Wardlaw, another daughter, $2000; to Caroline Bell, aforesaid, $5000 in trust for the education, improvement and benefit of her father's family; that as to the legacies to William R. Kitchen, in case he should die before the testator, they should go to his wife for life, and after her death to their children; and he directed his executors to convert the rest residue and remainder of his estate into money, and after payment of his debts, &c., that it be given to, and divided between five persons named, one of whom was said Kitchen, in proportion to the legacies given to, or in trust for them by will, to be added as an increase thereof, and that all lapsed legacies be included in that residuum; and appointed Kitchen and Henry Booth his executors.

The first codicil bears date 24th day of September,

1873, in which he recites the fact that on the 7th day of November, 1872, he had made the codicil which he revokes; and annuls all other codicils theretofore made by him, and revokes the appointment of Henry Booth as one of the executors of his will, and substitutes James L. Worth as executor in his stead, confirming the appointment of said Kitchen as such executor, and also revokes the appointment of said Booth as trustee in favor of Harriett Marshall, and substitutes W. Kitchen as such trustee, and he revokes the legacy of $7000 to said Booth in the will, and the legacy of $3000 to Ophelia G. Booth, and directs that said Booth shall have the privilege to bury any member of his family in testator's lot in Greenwood Cemetery; and gives certain other legacies, which are to be subject to the full payment of the legacies given in his will, and provides that the legacies mentioned in the codicil shall be paid *pro rata*, in the event that there shall not be sufficient of his estate to pay them in full; and among other legacies, he bequeathed the sum of $2000 to Mr. Kitchen in trust, to be invested for the maintenance and education of William H. Booth, son of Henry Booth, the principal sum to be paid to him on his attaining 21 years of age; also $2000 to said Kitchen, in trust for the maintenance and education of Ophelia G. Booth; and $2000 to said Kitchen, in trust for Thomas J. Booth, another son, upon and in the same manner as the like sum to said Kitchen, in trust for Ophelia, and William H. Booth, payable in the same manner; he also directs his executors to cancel and destroy all notes and obligations held by the estate, made by Henry Booth and Peter G. Marshall, indi-

vidually, or in the firm name of Booth & Marshall, and directs them to release the indebtedness created by said notes and obligations. The second codicil, being the one under contest, bears date July 6, 1874, whereby he revokes the privilege given by said codicil to Henry Booth to bury his family in his lot in Greenwood Cemetery; he also revokes the legacy of $2000 given in trust to said Kitchen for said Booth's three sons and daughters. Among other legacies, he gives to Anna L. Kitchen, daughter of William Kitchen, $2000; to William R. Kitchen, Jr., son of Kitchen, and John H. Kitchen, another son, each $2000; to John B. Wardlaw, $3000; Albert D. Wardlaw, $3000; Bessie Wardlaw and Cory Wardlaw, each $1000; to Caroline B. Wardlaw, $5000 in trust, to be used at her discretion for the relief of her relatives, and he revokes the clause of his codicil directing his executors to cancel the notes and obligations of Booth and Marshall, and of the firm of Booth & Marshall, and directs them to release Marshall, but collect the amount due from Booth *to the full extent of the law*, and directs that the legacies given by this second codicil shall be paid in the same manner and under the same conditions as those given in the first codicil, the legacies of the will to be first paid in full, and the legacies by the second codicil share and share alike.

It is conceded by counsel for the contestants that the proof of the due execution of the codicil in question is sufficient, and in reference to the consideration of the testimony in the case, it will only be necessary to extract so much of it as relates to the questions above suggested, which are involved in this contest.

[After a review of the testimony, the surrogate proceeded as follows :]

A careful review of the testimony satisfies me that the deceased, at the time when he executed the codicil in question, was of sound and disposing mind, and that his mental faculties at that time had not become materially impaired; and the same testimony shows that the codicil in question was produced before the witnesses by deceased, and he declared it to be a codicil to his will; subsequently showed a familiarity with its provisions, explaining its purposes and the reasons for certain changes from his will and first codicil; and that he read the whole will audibly to Mrs. Pollock, some three weeks before his decease.

The only question therefore left to be determined is, whether, under these circumstances, the fact that the codicil appears to be in the handwriting of Mr. Kitchen, whose children are alleged to have been made greater beneficiaries than they would have been but for the codicil, raises such a presumption as to require further proof as to the knowledge of the testator of the provisions of his will, and his intelligent, unbiassed disposition of his estate.

In Barry *v.* Butlin (1 *Curteis,* 637), it was held that the *onus probandi,* in every case, lies upon the party who propounds a will, and that where the party who prepares a will takes a benefit under it, this is a circumstance which excites the suspicion of the court, and unless that suspicion be removed the court will not pronounce in favor of the instrument. In that case, the will was prepared by the deceased's solicitor, under which he took considerable benefit, and which

excluded testator's only son, and the deceased was of weak mind.   Baron Parke, in discussing this rule, says: " The strict meaning of the term *onus probandi* is this, that if no evidence is given by the party on whom the burthen is cast, the issue must be found against him. In all cases this *onus* is imposed on the party propounding a will.   It is, in general, discharged by proof of capacity and the fact of execution from which the knowledge of, and assent to the contents of the instrument are assumed, and it cannot be that the simple fact of the party who prepared the will, being himself a legatee, is in every case and under all circumstances to create a contrary presumption, and to call upon the court to pronounce against the will, unless additional evidence is produced to prove the knowledge of its contents by the deceased.   All that can be truly said is, that if a person, whether attorney or not, prepares a will with a legacy to himself, it is, at most, a suspicious circumstance, of more or less weight, according to the facts of each particular case ; in some of no weight at all.   Nor can it be necessary that in all such cases, even if the testator's capacity is doubtful, the precise species of evidence of the deceased's knowledge of the will is to be in the shape of instructions for, or reading over the instrument.   They form, no doubt, the most satisfactory—but they are not the only satisfactory—description of proof by which the cognizance of the contents of the will may be brought home to the deceased."

In that case, the will was admitted to probate on proof of the alienation of the testator from his son, notwithstanding the testator was concededly of weak

capacity, and at page 647, the same learned judge says: "Whitehead's (the counsel who drew the will) authority and power over his master (the testator) are no doubt sufficiently established, but that such authority and power were in any way exercised to procure this will to be made, is only conjecture, and there is nothing like proof of authority or control of any kind on the part of Butlin or Percy" (the other witness named). It follows, as it would seem, that the mere fact of the writer of the will taking a benefit under it, does not necessarily require proof affirmative that the testator knew the contents of the will or gave instructions for its draft. But the undue influence and importunity which, if they are to defeat the will, must be in the nature of fraud or duress exercised on the mind in a state of debility.

In the case of Delafield v. Parish (25 *N. Y.*, 9), which has been considerably misunderstood, on account of the very imperfect head note of the reporter, the facts were that the testator, in full health, made a will, after an attack of paralysis, from which time his wife was hardly ever absent from his presence, and she and her relatives were his constant companions and attendants, to the exclusion, almost wholly, of his own relatives. The codicil was prepared under his wife's suggestions, which was executed after he was supposed to have recovered from the severity of the attack, but which was subsequently re-executed on account of some doubt of the testator's capacity when first executed. Subsequently, after the making, with the aid of her brother, an estimate of his estate, his wife drew up instructions for the disposition of another

large sum, and procured counsel to draw up another. codicil, which was principally for her benefit. Subsequently another codicil was executed, which was prepared by the same counsel under the like injunctions from the wife, which revoked the residuary gift and devise to two brothers of the testator, and substituted the wife as residuary legatee. It also appeared that the testator, before his attack, was a person of placid, courteous manner, with great command of his temper, but that he became thereafter transformed into a rude, discourteous, indelicate, violent man. It also appeared that he had a great affection for his two brothers, the residuary legatees named, and that he never changed in his apparent affection for them, and that testator, after his attack, never uttered an intelligent word — that his wife frequently acknowledged that she could not understand him. In affirming the judgment of the surrogate rejecting the codicil, a majority of the court concurred in the following propositions : —

That at common law and under our statutes the legal presumption is that every man is *compos mentis,* and the burthen of proof that he is not rests on the party who alleges that an unnatural condition of mind exists in the testator. He that sets up the fact that the testator was *non compos mentis* must prove it ; that in law the only standard as to mental capacity, in all who are not idiots or lunatics, is found in the fact whether the testator was *compos mentis* or *non compos mentis,* as those terms are used in their fixed legal meaning.

That the question in every case is, had the testator *compos mentis* capacity to make a will, not had he

capacity to make the will produced. If *compos mentis*, he can make any will, however complicated; if *non compos mentis*, he can make no will, not the simplest. That he must be of sound and discerning mind and memory, so as to be capable of making a testamentary disposition of his property with sane judgment, with reference to the situation and amount of such property, and to the relative claims of different persons who are, or might be, the objects of his bounty, and the scope and bearing of his will; but when it is sought to establish a posterior will, and overthrow a prior one made by the testator in health and under circumstances of deliberation and care, which is free from all suspicion, and when the subsequent will was made he was in enfeebled health, or mistook the provisions of the first, in no such case the prior will is to prevail, unless he who sets up the subsequent one can satisfy the conscience of the court that he has established the will, and so proven it to speak the testator's intention as to leave no doubt that it does so speak it. That the maxim " *Qui se scripsit hæredem* " has imposed by law an additional burthen on those claiming to establish the will, under circumstances which call for the application of that rule, and the court, in such a case, justly requires proof of a more clear and satisfactory character.

Vreeland *v.* McClelland (1 *Bradf.*, 393,) was a case where an executor of an estate, who had never accounted, but kept the assets in his hands, and paid a small sum over to the beneficiary, who was of intemperate habits and weak mind, and who was dependent upon him for satisfaction of his pecuniary wants. The

will was drawn by the executor's counsel, by which the testator gave all his property to said executor and uncle, and immediately after the execution of the will the executor paid to the testator $500 for the expenses of a journey he was about to take to Mexico. It was held that the will, having been made under such circumstances — drawn in favor of the executor or trustee when still in the active management of the estate—not having accounted with the *cestuis-que-trust*, it could not be supported without satisfactory evidence of its entire fairness, the fiduciary relation between the parties creating a presumption against the act. In Mowry *v.* Silber (2 *Bradf.*, 149,) it appeared the will was made discriminating against the other of testator's children in favor of a daughter, at whose house the will was executed under the supervision of her husband, who engaged the lawyer to draw it, arranged as to the fee, suggested the witnesses, fixed the time of execution, &c., was solely present when the instructions were given and when the will was read, though one of the testator's other daughters was in the house — knowing nothing of the will or its execution — that the decedent had never indicated any preference or partiality among his children. He lost his wife, which greatly affected him; that he understood English so imperfectly — spoke it in so broken a manner — that it was difficult to understand him, and necessary, in order to hold a protracted conversation, to repeat and explain frequently; that, on the death of his wife, he surrendered himself to melancholy despondency; his memory became impaired; he repeated the same thing several times in the course of

the same conversation; had a *monomania* on the subject of his wife's death. The learned surrogate refused the probate.

In Tyler *v.* Gardiner (35 *N. Y.*, 559,) the will propounded was made within four hours of the decease of the testatrix, Mrs. Tyler. The principal beneficiary, who wrote out the provisions which she desired inserted in the will, wrote to the lawyer who drew the will, directing him as to its terms, and fixed the time for him to call with it. The testatrix's faculties were enfeebled by long and wasting disease; she had been under the controlling influence of Mrs. Tyler, her daughter, who had imbued her with causeless antipathy to her only son, induced her to expel him from her house, and pursue him with inveterate accusations, and the will involved a complete revocation of intention, the entire departure from her previous testamentary disposition, and was made under a mistaken impression, recently imbibed, that her son had been unfaithful and fraudulent, as her agent, in managing her property; that Mrs. Tyler was poor, and the disposition of her property was grossly unequal and unjust. It was held that these facts raised a presumption of undue influence, requiring the party to whom it was imputed to give proof to repel it.

I have carefully considered the authorities cited by the contestant's counsel, and upon them alone I should hesitate to hold that the proof in this case is insufficient to admit the second codicil to probate, for the reason that it seems to me that there can be no reasonable doubt of the clear mental soundness of the testator at the time when it was exeeuted, because there is no proof

which tends to show undue influence exercised upon the mind of the testator, and it does appear uncontradicted that subsequent to its execution, and when his mind was entirely·clear, he read his will and codicils to, and discussed them with, Mr. Kitchen (one of his executors) and stated the reason of his changed purpose in respect to Mr. Booth (the contestant) to Miss Pollock, nor do I think that the testimony shows the relation of Mr. Kitchen with testator to be either fiduciary, influential, or confidential. (Voorhees v. Voorhees, 39 *N. Y.*, 463; Marvin v. Marvin, 3 *Abb. Ct. of App. Dec.*, 192; Cristell v. Dubois, 4 *Barb.*, 393; Darley v. Darley, 3 *Bradf.*, 481; Lake v. Ranney, 33 *Barb.*, 49; Van Pelt v. Van Pelt, 30 *Id.*, 134.) The only evidence showing that relation is that the deceased frequently visited Mr. Kitchen at the bank of which he was president; that Mr. Kitchen, while he was ill, called frequently; and that the testator, in giving reason for his legacy to him, stated that it was because he had served him faithfully in business for twenty years, without stating the manner, (and evidently he had never been in Mr. Dyer's employment as agent or otherwise); and that when his property was in danger of being confiscated during the war, it was saved through Mr. Kitchen's influence. From the authorities thus far considered, I am unwilling to hold that the mere fact that the codicil changes the provisions of the will and prior codicil, and appears to be in the handwriting of one of the principal beneficiaries, raises a presumption of undue influence or fraud, which is not fully overcome by the clear mental capacity of the testator, his statement of the reasons of the

change, and his intelligent discussion of its provisions, after he had read them, subsequent to its execution. But I now proceed to a consideration of cases which seem to make for the probate of this codicil cited by proponents' counsel.

In Coffin v. Coffin (23 *N. Y.*, 9), Mr. Justice Comstock (at page 13) cites the case of Barry v. Butlin (above cited) with approbation. In Leaycraft v. Simmons (3 *Bradf.*, 35,) the decedent was 89 years old; made a will at his son's residence, which appeared to be in his son's handwriting, and was executed without the knowledge of his daughter (his only other child); but the proof showed that the decedent was of undoubted capacity. It appeared that the son had acted as his agent, and took the largest share of the estate under the will; that testator expressed a desire to make a codicil, in order to enlarge the provisions in favor of his daughter, and so stated to his son, who had custody of the instrument, and requested him the next day to bring it with him. His son failed to come as he was accustomed to, and no such codicil was executed. It was held that, under such circumstances, it was proper to call for further proof of recognition of the will by decedent. Such proof was furnished by showing that he spoke of the terms of the will after its execution, although he expressed a desire to change it.

In Durling v. Loveland (2 *Curteis*, 225), the testator was 76 years of age, of doubtful capacity, whose will was prepared by a solicitor, who was appointed executor and one of the residuary legatees. The will was refused probate, because the court held that there

was no proof, except the bare execution, which was not sufficient; but (at page 227) Sir Herbert Jenner says: "It never was a doctrine of this court, whatever may have fallen from this chair, that without reading over, or without instructing, it is impossible to pronounce for such a will. I never understood the doctrine of this court to go beyond this, viz., that it is a circumstance which should awaken the vigilance and. the jealousy of this court to watch and see whether, by some means or other, knowledge of the contents was brought home to the deceased, or it was shown that it was the intention of the deceased to make such disposition of his property, which the court would accept as sufficient proof, notwithstanding that the drawer of the will took considerable benefit under it. I do not apprehend that there is any technical rule which requires proof that the will has been read by or to the deceased, or that it was prepared from instructions given by him." (See *Jarman on Wills*, page 45.)

In Harrison *v.* Rowan, (3 *Washington C. Ct.*, 580), the court says: "It is not necessary, in order to establish the will, that the person claiming under it should prove that it was read over to the testator in the presence of the attesting or other witnesses. The law presumes in general that the will was read over by or to the testator."

In reflecting upon the very forcible and somewhat severe expression of the testator in his codicil respecting the enforcement of the claim against Mr. Booth, I was at first disposed to think that, taken in conjunction with his prior legacies to him and his children, the revolution in his intention must have been the result of some prejudice or some supposed dereliction

on Mr. Booth's part; but upon further consideration, if, as I am forced to conclude from the evidence, the testator acted with deliberation and intelligence, it seems to me just as reasonable to suppose that something had occurred between him and testator to alienate the mind of the latter, as in the absence of proof to assume that it was the result of undue influence on the part either of Mr. Kitchen, who is not shown to have had any hostility towards Mr. Booth, or by young Wardlaw, who had no acquaintance with him, and who, as a young man of twenty, it would be absurd to suppose had intrigued to control the disposition of decedent's property, which is not seriously claimed by contestants' counsel.

To establish undue influence over the testator at the time of the execution of his will, it must appear that the importunity or influence was such as to deprive him of the free exercise of his will. (Gardiner *v.* Gardiner 34 *N. Y.*, 155, and other cases cited.)

Undue influence is such as to impose a restraint on the will of the testator, so as to prevent him from doing what he wishes to do, or forces him to do what he does not wish to do.

I have not deemed it necessary to discuss the question raised as to whether Mr. Kitchen's family will receive more or less by reason of the second codicil, but I assume, for the purposes of this case, that his interest and the interest of his family is increased by that codicil, and if it were not so, there is the same difficulty in accounting for the revolution of the testator's mind and purpose in respect to Mr. Booth and his family, and which, if it were necessary to make an

explanation by reason of the impaired faculties of the testator, would present the most embarrassing questions in the case.

Upon the best and most thorough consideration of the testimony and the authorities bearing upon the case which I have been able to bestow, I cannot resist the conclusion that the testator was of sound and disposing mind, free from undue influence, when he executed the codicil in question, and that he had full knowledge of, and comprehended, its contents and provisions.

I am unable to deduce from the numerous authorities upon the subject, the principle that the mere fact that the subsequent will or codicil reverses some of the provisions of the prior will in favor of one, in whose handwriting such subsequent will or codicil appears, overcomes the legal presumption that an intelligent testator, who executed a will according to law, understood its terms, and, in the absence of affirmative proof of undue influence, executed it without restraint.

Indeed in the cases where the maxim *"Qui se scripsit hæredem"* has been held to impose upon the proponent proof of a more clear and satisfactory character, there has intervened the element either of impaired faculties or weakened mind, or some affirmative evidence tending to show undue influence or some intimate relation of a confidential or fiduciary character between the testator and the writer of the will.

The second codicil in question should be admitted to probate.

Order accordingly.